# Yankee Microwave, Inc. *vs.* Petricca Communications Systems, Inc., & others.[1]

No. 98-P-559.

Berkshire. January 19, 2000. - January 7, 2002.

Present: Jacobs, Gillerman, & Gelinas, JJ.

*Practice, Civil,* Findings by judge. *Res Judicata. Administrative Law,* Agency, Preclusive effect of decision, Adjudicatory proceeding, Retroactive effect of regulation, Rate regulation, Judicial review. *Federal Communication Commission. Massachusetts Uniform Fraudulent Conveyance Act. Fraudulent Conveyance. Loan. Contract,* Service agreement. *Corporation,* Recapitalization, Corporate disregard.

Where a corporation (ACC), which sought to assume a service agreement between the provider of radio microwave transmission services for voice and data communications (Yankee) and a long-distance telephone company (PCS), sought to have the Federal Communications Commission (FCC) take "primary jurisdiction" over the service agreement and adjudicate a dispute between the parties, application of Federal principles of res judicata and claim preclusion to State court proceedings precluded PCS, a company in privity with ACC, from raising in the Superior Court its claim that Yankee was in breach of contract for failing to file tariffs as required by the Federal Communications Act, and also precluded retroactive application of *MCI Telecommunications Corp.* v. *Federal Communications Commn.*, 765 F.2d 1186 (D.C. Cir. 1985), which concluded that the FCC rule forbidding nondominant carriers from filing tariffs was invalid as exceeding the authority of the FCC. [504-511]

This court concluded that a provider of radio microwave transmission services for voice and data communications (Yankee) that had entered a service agreement with a long-distance telephone company was under no legal obligation to obtain the approval of the Department of Public Utilities for rates established under the service agreement and that there was no illegality in Yankee's performance under the intrastate portion of the service agreement, where Yankee was not a common carrier but rather acted as a private contract carrier, and thus was not subject to the filing requirements of G. L. c. 159. [511-513]

In an action by a provider of radio microwave services (Yankee) for breach of a service contract with a long-distance telephone company (PCS) in which Yankee raised a claim for fraudulent conveyance arising from monetary advances from a holding company (PII) to PCS and subsequent repayment

---

[1]Petricca Industries, Inc., Basil A. Petricca, and Robert W. Petricca.

to PII, the judge correctly concluded that the Massachusetts Uniform Fraudulent Conveyances Act (MFCA), G. L. c. 109A, did not apply, where the record did not contain specific allegations or factual evidence that would permit a determination that the judge's finding, that there was no actual intent to hinder, delay or defraud Yankee, was clearly erroneous, and where there was no error in determining that the repayment was made to a separate entity, for antecedent debt, and that there was "fair consideration" within the meaning of the MFCA, and thus no fraudulent conveyance [513-519]; further, where there was no error in the judge's failure to apply the doctrine of corporate disregard, there was no error in his conclusion that as PII was not a director of PCS, the rule to the effect that directors may not pay themselves, even for legitimate debt, if such payment would render the company insolvent, did not apply [519-521].

In an action by a provider of radio microwave services (Yankee) for breach of a service contract with a long-distance telephone company (PCS) in which Yankee claimed certain repayments from PCS to two shareholders constituted fraudulent conveyances, the judge erred in finding that the repayments were not improper, where the initial payments from the shareholders to the undercapitalized PCS were loans needed as a substitute for capital necessary to the operation of PCS, and thus subordinate to claims of creditors, including Yankee; consequently, the loan repayments, with such prejudgment interest as shall be determined by the trial court, were ordered to be returned to PCS or made available for any judgment that Yankee might obtain. [521-524]

This court remanded the case to the trial court for a hearing on the issues of actual damages and of mitigation. [525]

CIVIL ACTION commenced in the Superior Court Department on February 5, 1992.

The case was heard by *Daniel A. Ford*, J.

*A. Hugh Scott* for the plaintiff.

*Ronald E. Oliveira* (*William E. Martin* with him) for the defendants.

GELINAS, J. We consider in this case whether Yankee Microwave, Inc. (Yankee), is precluded from recovery against Petricca Communications Systems, Inc. (PCS), Petricca Industries, Inc. (PII), Basil A. Petricca (Basil), and Robert W. Petricca (Robert), because, as the trial judge found, Yankee failed to file for tariff approval with the Federal Communications Commission (FCC) and the Massachusetts Department of Public Utilities (DPU), thus rendering its performance under the parties' contract for microwave transmission services (service agreement) illegal and void. We also consider (1) Yankee's contention that the trial judge erred in finding that certain

transfers of money from PCS to PII, Basil, and Robert were not improper and did not constitute fraudulent conveyances, and were not in violation of G. L. c. 156B, § 61; (2) PCS's contention that the trial judge erred in entering judgment in favor of Yankee on PCS's counterclaims alleging breach of contract, breach of a covenant of good faith, and violation of G. L. c. 93A; and (3) PCS's contention that Yankee is barred from recovering damages from PCS by Yankee's own breach of the service agreement when it refused to agree to the assignment of the service agreement to ACC Corporation (ACC). We reverse that part of the judgment declaring that Yankee's performance under the service agreement was illegal, and that the transfer of funds to Basil and Robert by PCS in repayment of certain loans was proper. We affirm that part of the judgment entered in favor of Yankee on PCS's counterclaims, as well as that part of the judgment requiring Robert to disgorge certain funds paid to him for his capital stock in PCS and ruling that certain payments to PII by PCS were proper. We remand the case to the Superior Court for further proceedings on the issue of damages.

*Facts.* We summarize the facts found by the trial judge, supplemented by additional uncontested evidence appearing on the record, reserving details for our discussion of the issues.

A. *Background.* During the relevant time period, Yankee provided radio microwave transmission services for voice and data communications. PCS was a new, long-distance telephone company, providing service to consumers in western Massachusetts. PCS was formed in 1982 by Basil and Robert, brothers involved in a number of businesses in the construction industry, including three corporations owned by PII, a holding company. In 1984, the PCS telephone network consisted of leased services provided by American Telephone & Telegraph Company (AT&T) and New England Telephone. PCS purchased service in bulk and resold discrete units to customers at retail. The bulk service purchased from AT&T was expensive, and in the first years of deregulation of the communications industry, the agreement with AT&T left PCS vulnerable to sudden rate increases. As technology improved, competition fostered price reductions, creating a volatile, downward pricing spiral. Rather than anticipate potential price reductions as a result of deregula-

tion, PCS made the decision to seek out a carrier who would provide service at a fixed, stable rate, on a long-term basis. Competitive pressures, resulting in rate declines, determined that this business strategy was ultimately wrong.

B. *The service agreement.* In 1984, Yankee was planning a digital microwave system to serve the corridor from Boston to New York. PCS contacted Yankee in May of that year, seeking to contract for digital microwave transmission services. During the next few months Yankee developed a plan to carry PCS's long distance telephone traffic at fixed rates. On January 31, 1985, Yankee and PCS signed a six-year service agreement for digital microwave service. Yankee's charges under the service agreement were based on its anticipated total capital outlay for the PCS project of $1,629,300, plus other related costs, including debt service, and Yankee's desired profit. This total, divided by seventy-two, the number of months to be covered by the contract, produced a monthly fee to PCS of $44,284.40, a charge approximately $40,000 less than the $85,000 per month that PCS was then paying for service from AT&T. The six-year term offered PCS the stability of rates that it was seeking. PCS accepted Yankee's proposal in December, 1984, and the parties signed the service agreement[2] the next month.[3] In April, 1985, the service agreement was expanded, at PCS's request, to add service to Boston, and the monthly fee was increased to $54,985. The service agreement required Yankee to file a tariff with the FCC.[4]

C. *Guarantees, and the sale of PCS.* Based on PCS's financial condition, Yankee required that payments under the service

---

[2]The service agreement identified rates for various point-to-point locations. All but one were for intrastate service.

[3]At the same time, the parties signed a "License Agreement," allowing Yankee to use a tower to be built by PCS, needed to transmit signals from the Berkshire Valley to Yankee's network. PCS wanted to own the tower in order to control competitors' access to the Berkshire County area. The tower was eventually built in the town of Washington.

[4]The service agreement provided, in relevant part:

"10. Except for the obligations set forth in Paragraph 9 above . . ., all other obligations hereunder shall become effective on the grant by F.C.C. of the necessary authorizations. [Yankee] hereby agrees that it will commence construction as soon as reasonably possible after receipt of such authorizations.

" . . . .

agreement be guaranteed; after discussion, the parties agreed that Petricca Construction Corp. (PCC), a wholly-owned subsidiary of PII[5] would guarantee the first eighteen payments. Yankee then began building the necessary long-distance microwave transmission system, completing construction in 1986. PCS requested that the start of service be delayed to February of 1987. Yankee agreed, and the service agreement was amended to that effect on December 4, 1986. Service began in February, 1987. Prior to the inception of service, with PCS experiencing serious financial difficulties, Basil and Robert sought a buyer for the company. In late 1986, PCS entered into discussions with ACC.[6] The parties reached agreement, under which ACC would acquire the assets of PCS, paying PCS $1.8 million in cash together with a warrant to purchase 100,000 shares of ACC stock at a favorable price. A closing was scheduled for January 31, 1987. Prior to the closing, ACC sought to assume the service agreement between Yankee and PCS. Last minute efforts to secure Yankee's permission, required by the service agreement for such assignment, failed. The PCS-ACC sale went forward only after ACC agreed to pay for Yankee's services, on a pass-through basis, for a period of eighteen months. This period was consistent with PCC's guarantee, thus obviating the need for an assignment of the service agreement to ACC. After receiving service and paying monthly fees for eighteen months, ACC stopped the pass-through payment, and PCS defaulted on its obligations under the service agreement.

---

"21. [Yankee] and [PCS] agree that all services rendered by [Yankee] will be subject to the provisions of a tariff to be filed with the Federal Communications Commission. All provisions of this Agreement are to be construed in light of the then effective tariff. In the event of any conflict between the terms of this Agreement and the then effective tariff, the provisions of the Agreement shall be deemed modified to conform to the tariff provision."

[5]PCS was wholly owned by Basil and Robert as the two sole stockholders. PII was a holding company, whose stockholders were Basil, Robert, various members of Basil's family, and Peter Petricca, brother of Basil and Robert. Basil and Robert were directors and officers of PII and its subsidiaries.

[6]ACC Teleconnect Corporation changed its name to ACC Corporation in January of 1987; we use ACC to refer to that corporation.

D. *The litigation.* Yankee first pursued PCS in Federal District Court.[7] After dismissal of its claims in Federal court, Yankee filed suit in Superior Court in early 1992, alleging, among other things, breach of contract, fraudulent conveyance of PCS assets, and breach of directors' duties.[8]

In Superior Court, PCS, PII, Basil, and Robert (collectively the defendants) all claimed as an affirmative defense that Yankee had breached the service agreement because Yankee had not received Federal and State tariff approval of its rates, as required in the service agreement. Yankee's performance under the service agreement was thus illegal, since provision of service without obtaining tariff approval violated both the Federal Communications Act of 1934, 47 U.S.C. §§ 151-609 (1976) (Act), and G. L. c. 159. As an additional defense, the defendants claimed that the rates were not just and reasonable under §§ 201 and 203 of the Act. The defendants also counterclaimed against Yankee, alleging breach of contract, breach of the covenant of good faith and fair dealing, and violation of G. L. c. 93A.

In the spring of 1992, the defendants successfully moved for a stay of the Superior Court case, pending the outcome of proceedings before the FCC challenging the lawfulness of Yankee's rates. These proceedings were brought in April, 1992, by ACC. The Superior Court judge found and ruled that PCS was in privity with ACC with respect to the FCC proceedings,

---

[7] Yankee sued ACC and its parent company, PCS, and others in the United States District Court for the District of Massachusetts in 1990, alleging violation of the Racketeer Influence and Corrupt Organization (RICO) statute, breach of contract, and interference with contractual relations based on PCS's failure to honor the service agreement. In January of 1992, the District Court entered summary judgment in favor of all defendants on the RICO and related claims, and dismissed Yankee's claim of breach of contract and other alleged violations of Massachusetts law because of lack of subject matter jurisdiction.

[8] Yankee's fifteen-count complaint contained claims not relevant to this appeal. ACC and ACC Long Distance Corp. (ACC-LD), a company related to ACC, were parties in the suit below. The Superior Court determined that ACC-LD owed Yankee $107,422.26, "subject to such damages as ACC-LD may be awarded for Yankee's breach of the 1987 Service Agreement, by way of set off." No award to ACC-LD appears on the record. Neither ACC-LD nor any of the ACC corporations are parties to this appeal.

and that ACC acted as PCS's "virtual representative" before the FCC.[9]

E. *The FCC proceedings.* Among other allegations, ACC claimed in its complaint to the FCC that the rates charged in the service agreement were unlawful and discriminatory, in violation of §§ 201(b) and 202(a) of the Act. In its initial complaint, ACC made no specific claim for relief based on Yankee's failure to file for tariff approval under § 203 of the Act, although it did assert that the failure to file as required by the service agreement constituted a violation of §§ 201 and 202. ACC asked the FCC to take "primary jurisdiction of the legality" of the service agreement. The FCC's Common Carrier Bureau (bureau) ruled in favor of Yankee on these issues. See *ACC Long Distance Corp.* v. *Yankee Microwave, Inc.*, 8 F.C.C. Rcd. 85 (1993). ACC appealed the bureau's decision to the full commission. In its appeal, ACC raised Yankee's failure to file tariffs under § 203, urging the commission to overturn the bureau's decision because the bureau had failed to order Yankee "to file tariffs pursuant to Section 203 of the Act." The full commission found and ruled that the bureau had determined that there was no basis upon which to order Yankee to file tariffs, and that the bureau was correct in that determination. *ACC Long Distance Corp.* v. *Yankee Microwave, Inc.*, 10 F.C.C. Rcd. 654 (1995). Further, the commission ruled that, as ACC's initial complaint did not allege a violation of § 203, any such claim was new, and would be rejected on appeal, as "Section 1.115(c) of our rules specifically provides that '[no] application for review will be granted if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass.' " *Id.* at 659. ACC did not further appeal the commission's determination; the stay was lifted and trial proceeded, jury waived, in Superior Court.

F. *The Superior Court decisions.* The Superior Court issued two decisions, in February, 1995, and May, 1996. On Yankee's contract claim, the trial judge found that PCS had breached the

---

[9]The parties have stipulated that ACC's counsel informed PCS of the FCC proceedings in advance and that PCS declined to join in the proceedings. During 1992, 1993, and 1994, ACC's counsel communicated with PCS's counsel about the FCC proceedings.

service agreement, but that Yankee could not recover because Yankee's rates had not been filed in an appropriate tariff with the FCC, and had not been approved by the DPU. On Yankee's fraudulent conveyance claim and on its claim for breach of directors' duties, the trial judge ruled in part for Yankee and in part for PCS, PII, Basil, and Robert. On the defendants' counterclaims, the trial judge ruled in favor of Yankee. Yankee and the defendants both appealed.

G. *The standard of review.* We review this case under the well-established standards applicable to civil cases heard by a judge without jury. We accept the judge's findings of fact as true unless clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *Kendall* v. *Selvaggio,* 413 Mass. 619, 620-621 (1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *J.A. Sullivan Corp.* v. *Commonwealth,* 397 Mass. 789, 792 (1986), quoting from *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 395 (1948). As to matters of law, however, "we scrutinize without deference the legal standard which the judge applied to the facts," and "the 'clearly erroneous' standard of appellate review does not protect findings of fact or conclusions based upon incorrect legal standards." *J.A. Sullivan Corp.* v. *Commonwealth,* 397 Mass. at 792, citing *Marlow* v. *New Bedford,* 369 Mass. 501, 508 (1976). We set aside a judge's ultimate conclusion if we find it either "clearly erroneous or inconsistent with the relevant legal standard." *Johnson* v. *Modern Continental Const. Co.,* 49 Mass. App. Ct. 545, 547 (2000).

*Discussion.* A. *Failure to file tariff with the FCC.* In its answer to Yankee's complaint, and on appeal here, PCS asserts that the service agreement was illegal because Yankee failed to file a rate tariff with the FCC with regard to the rates charged PCS, and therefore, the service agreement "is void because the rates contained therein are not just and reasonable, are not pursuant to a filed tariff, and are unlawfully discriminatory, all in viola-

tion of the Communications Act of 1934 and G. L. [c. 159]."[10] Yankee countered, contending that under the FCC's *Policy & Rules Concerning Rates for Competitive Common Carrier Serv. & Facilities Authorization Therefor: Fourth Report & Order*, 95 F.C.C.2d 554 (1983) (*Fourth Report*), filing a rate tariff was optional for nondominant carriers such as Yankee.[11] The trial judge found and ruled that, on authority of *Astoria Fed. Sav. & Loan Assn.* v. *Solimino*, 501 U.S. 104 (1991), collateral estoppel applied as to those issues directly raised before the FCC by ACC, and that PCS was thus precluded from relitigating the issues of Yankee's alleged violation of §§ 201 and 202 of the Act, i.e., from litigating again the issue of whether the rates were unjust, unreasonable or unlawfully discriminatory. However, the trial judge also found, as to the illegality of the rates charged because of Yankee's failure to file for tariff approval under § 203 of the Act, that ACC had not raised the issue in its original complaint before the bureau, and had been prevented from raising it before the commission on appeal. The trial judge concluded that this issue had not been fully litigated before the FCC and, therefore, PCS was not precluded from raising the issue in State court.

A series of Federal cases led ultimately to the *Fourth Report* being held beyond the scope of the FCC's authority under the

---

[10]There is no question that PCS asserted a contract defense, i.e., that Yankee did not fulfill one of the conditions of the contract, by failing to file rate tariffs with the FCC and the Massachusetts DPU. The trial judge found that, prior to the beginning of service, Yankee gave PCS express written notice that Yankee would not file a tariff with the FCC but instead would provide the service on a nontariffed, private contract basis, as then permitted by the FCC. PCS did not object, and accepted and paid for the service on a nontariffed basis for eighteen months. At one point, ACC expressly raised with PCS the possibility of challenging the legality of the contract based on the fact that no tariffs had been filed either with the FCC or with the Massachusetts DPU. PCS decided not to pursue such a course of action, and continued to receive and pay for the services. Based on these findings, the trial judge ruled that PCS had waived its right to raise objection to Yankee's noncompliance with paragraphs 10 and 21 of the service agreement. See note 4, *supra*.

[11]In order to reduce regulatory burdens and promote competition, the FCC instituted a "forbearance" policy, under which nondominant carriers were no longer required to file rate tariffs, although they were permitted to do so. See *Fourth Report*, 95 F.C.C.2d at 575-582. It is uncontroverted that Yankee is a nondominant carrier.

then extant Congressional mandates.[12] See *MCI Telecommunications Corp.* v. *Federal Communications Commn.*, 765 F.2d 1186 (D.C. Cir. 1985) (FCC rule forbidding nondominant carriers from filing tariffs invalidated as exceeding the authority of the FCC); *Maislin Indus. U.S., Inc.* v. *Primary Steel, Inc.*, 497 U.S. 116, 130-136 (1990) (under filed rate doctrine, a common carrier may charge and receive only that amount contained in a tariff filed with the appropriate regulatory body); *MCI Telecommunications Corp.* v. *TCI Mail, Inc.*, 772 F. Supp. 64, 66-67 (D.R.I. 1991) (*Maislin* rationale applies equally to cases under the Federal Communications Act of 1934); *American Tel. & Tel. Co.* v. *Federal Communications Commn.*, 978 F.2d 727, 736 (D.C.Cir. 1992), cert. denied sub nom. *MCI Telecommunications Corp.* v. *American Tel. & Tel. Co.*, 509 U.S. 913 (1993) (FCC rule permitting nondominant carriers to avoid filing tariffs not permitted by language of 47 U.S.C. § 203[a] requiring that every common carrier file tariffs); *MCI Telecommunications Corp.* v. *American Tel. & Tel. Co.*, 512 U.S. 218 (1994) (*MCI*) (ruling 5-3 that the FCC's authority under 47 U.S.C. § 203(b) to "modify" the tariff filing requirement in § 203(a) could not be exercised to make tariff filing optional).[13]

PCS further asserted, and the trial judge agreed, that under Massachusetts common-law decisions governing the retroactive application of a judicial decision, *Schrottman* v. *Barnicle*, 386 Mass. 627, 631-632 (1982); *Tamerlane Corp.* v. *Warwick Ins. Co.*, 412 Mass. 486, 489-490 (1992), Yankee should have been on notice that optional filing under the FCC's *Fourth Report* would be declared invalid. We disagree.

Throughout the period when PCS accepted and paid for the service and prior to its breach of the service agreement, the FCC's *Fourth Report* was in effect. Under the *Fourth Report*, Yankee, as a nondominant carrier, was permitted to and did elect to render service without having to obtain tariff approval. PCS

---

[12]*Policies & Rules Concerning Rates for Competitive Common Carrier Serv. & Facilities Authorization Therefor: Sixth Report & Order*, 99 F.C.C.2d 1020 (1985) (*Sixth Report*), expanded the "permissive forbearance" policy rule by forbidding nondominant carriers from filing tariffs.

[13]The policy has since been reinstituted by Congressional action; the Act has been amended to give the FCC explicit authority to adopt "forbearance" rules. See 47 U.S.C. § 160 (1996).

did not contest the issue, even after being invited to do so by ACC. The Supreme Court's *MCI* case, which PCS urges should be applied retroactively, was decided in 1994, well after PCS had, as the trial judge found, defaulted on its contract, and after the FCC proceedings initiated by ACC had been concluded favorably to Yankee. In the meantime, in 1996, Congress amended the Act, the effect of which was to exempt nondominant carriers, such as Yankee, from filing tariffs. See note 13, *supra*. In effect, Congress adopted the policy articulated in the *Fourth Report* and *Sixth Report*. The 1994 *MCI* Supreme Court decision (with three dissenting justices supporting, on policy grounds, the FCC's authority to promulgate the disputed regulation) declared that the FCC had no authority, under its then enabling statute, to modify the requirement that tariffs be filed.

By declaring invalid and illegal the provisions of the *Fourth Report*, the *MCI* decision, far from establishing a new rule, effectively declared that Yankee's performance under an otherwise legal agreement was illegal. The question before the trial judge, then, was not whether the *MCI* decision established a new rule that should be given retroactive application, but whether the declaration of the regulation's invalidity should be given retroactive application; that is, should Yankee's performance in charging nontariffed rates, declared illegal by the decision in *MCI*, as matter of law preclude Yankee from collecting amounts due under a contract which was valid and enforceable when payments were due and payable. We conclude that it should not.

We apply the Federal principles of res judicata. See *Anderson v. Phoenix Inv. Counsel of Boston, Inc.*, 387 Mass. 444, 449 (1982) ("When a State court is faced with the issue of determining the preclusive effect of a prior Federal court's judgment, it is the Federal law of res judicata which must be examined").[14] See also *Paramount Aviation Corp.* v. *Gruppo Agusta*, 178 F.3d 132, 145 (3d Cir.), cert. denied, 528 U.S. 878 (1999); *Prudential*

---

[14]We note that, as to any claim of illegality due to Yankee's failure to file with the Massachusetts DPU, the Federal proceedings had no preclusive effect. *Anderson* v. *Phoenix Inv. Counsel of Boston, Inc.*, 387 Mass. at 449. Although ACC's complaint before the FCC asked that the FCC take "primary jurisdiction" of the service agreement, the FCC declined to exercise jurisdiction. *ACC Long Distance Corp.* v. *Yankee Microwave, Inc.*, 8 F.C.C. Rcd. at 86. We address that issue, *infra*.

*Secs., Inc.* v. *Arain*, 930 F. Supp. 151, 155-156 (S.D.N.Y. 1996); *Salem* v. *Massachusetts Commn. Against Discrimination*, 44 Mass. App. Ct. 627, 637 (1998). We see no reason why this principle should not extend to proceedings before Federal administrative agencies, as matters of issue preclusion and claim preclusion are identical with those applied in Federal court cases, where the administrative agency acts in a judicial capacity. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *United States* v. *Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966). A final judgment on the merits before a Federal administrative agency, acting in a judicial capacity in one action, "bars subsequent relitigation of the same claim by the same parties and by those in privity with the parties." *Greenberg* v. *Board of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir. 1992). See *National Labor Relations Bd.* v. *United Technologies Corp.*, 706 F.2d 1254, 1259 (2d Cir. 1983). The claim preclusion branch of res judicata applies to issues that could have been raised in the prior adjudication of that claim. *Securities & Exch. Commn.* v. *First Jersey Secs., Inc.*, 101 F.3d 1450, 1463 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997).

There can be no doubt that in the instant case the FCC was acting in an adjudicatory capacity. In its pleadings, ACC requested that the FCC take "primary jurisdiction of the legality" of the service agreement, and in both the hearing before the bureau and in its appeal to the full commission, ACC asked for a declaration of its rights and an award of remedy that would conclusively bind both parties with respect to the service agreement.[15] We conclude that, where ACC sought to have the FCC adjudicate the entire dispute between the parties, and PCS was in privity with ACC, PCS would have been precluded from raising any aspect of the Federal tariff issue, in any further Federal proceedings, save an appeal to the Federal courts, which

---

[15]As noted *supra*, the FCC declined jurisdiction of the intrastate portion of the service agreement, but that does not derogate from the Commission's adjudicatory character with respect to the interstate issues presented.

was not taken. Apart from any determination that PCS had waived its defense here, application of Federal principles of res judicata to the State court proceedings precludes PCS from raising in the Superior Court the claim that Yankee was in breach of contract for failing to file tariffs as required by the Act.

As noted, the issue is complicated by the fact that the *MCI* case declared the FCC's policy a nullity, in effect declaring that Yankee's completed performance in providing untariffed services illegal. As a general rule, one who has participated in a violation of the law will not be allowed to assert in court any right based upon or directly connected with the illegal transaction. See generally 5 Williston on Contracts § 12.2 (Lord 4th ed. 1993).

The courts will not reward illegal performance that "permeates the parties' transaction," even where the contract itself does not call for illegal performance. *Tocci* v. *Lembo*, 325 Mass. 707, 710 (1950) (no recovery where " 'illegality is serious or more than an incidental part of the performance' "). *Hastings Assocs., Inc.* v. *Local 369 Bldg. Fund, Inc.*, 42 Mass. App. Ct. 162, 176 (1997) (where "plaintiff cannot establish its case without developing the illegality in the transaction," illegality not merely incidental to claim and no recovery can be had on contract). But see *Town Planning & Engr. Assocs., Inc.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 746-747 (1976) ("[o]ur cases warn against the sentimental fallacy of piling on sanctions unthinkingly once an illegality is found"; recovery allowed where violation of statute not so serious as to defeat action); *Reynolds Aluminum Bldg. Prods. Co.* v. *Leonard*, 395 Mass. 255, 259 (1985) (where illegal part of performance merely 'incidental' part of contract, party claiming illegality defense not entitled to windfall). Under Federal law the tenor of illegal performance is now judged according to the specific facts of each case.

Federal courts "look directly at the extent and seriousness of the illegal conduct and its relationship to the contract at issue." *Nathan* v. *Tenna Corp.*, 560 F.2d 761, 765 (7th Cir. 1977). We conclude in this instance that there should be no retroactive application of the *MCI* case to Yankee's performance under the FCC's *Fourth Report*. We look again to Federal issues of res ju-

dicata and claim preclusion. The case of *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U.S. 371 (1940), is instructive. In *Chicot*, the Supreme Court considered whether Baxter State Bank should be bound by a decision of a Federal District Court, acting in a bankruptcy matter. Baxter State Bank had been a party to that original action.

The statute under which the Federal Court reached its decision was later declared unconstitutional and thus void. In a later suit, brought by Chicot County to enforce the Federal District Court's bankruptcy judgment, both the Federal District Court and the Circuit Court of Appeals ruled that the original judgment was void based on the statute later being declared unconstitutional. Writing for a unanimous court, Chief Justice Hughes declared that "[t]he actual existence of a statute, prior to [a determination of unconstitutionality], is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial decision. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects — with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination[, and] . . . an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." *Id.* at 374.

The Supreme Court ruled that, since all elements necessary to constitute the defense of res judicata were present, apart from the later declaration of unconstitutionality, Baxter State Bank was bound by the original judgment. The Supreme Court held that, having had the opportunity to raise the unconstitutionality of the statute in the original Federal bankruptcy case, Baxter State Bank was "not the less bound [by the original judgment] because [it] failed to raise it." *Id.* at 375. We see no reason why this principle should not apply as well to adjudicatory proceedings before administrative agencies, where the parties had full opportunity to pursue judicial review of the adverse finding.

The trial judge effectively found, apart from the issue of the

Supreme Court's declaration in *MCI* that the *Fourth Report* exceeded the scope of the FCC's statutory mandate, thus making Yankee's performance under the contract illegal, PCS had breached its agreement and Yankee was entitled to recover. PCS was in privity with ACC. ACC asked the FCC to take "primary jurisdiction" over the service agreement. ACC, and thus PCS, did not attempt to obtain judicial review of the FCC ruling. ACC, having had the opportunity to raise the question of invalidity, was not less bound by the FCC ruling. *Chicot, supra* at 375. As in *Chicot,* there should be no retroactive application of the regulation's invalidity here.[16]

B. *Massachusetts DPU Approval.* PCS also contends that, as to the intrastate portion of the service, Yankee's performance and the agreement were illegal, as Yankee failed to obtain tariff approval for its rates from the DPU. In its answer, PCS asserted that Yankee was subject to the provisions of G. L. c. 159, and more specifically, to §§ 14 and 17 thereof, requiring rates to be "just and reasonable," prohibiting "discriminatory" and "preferential" rates, declaring such rates to be unlawful, and subject as well to § 19, which prohibits a common carrier from demanding or collecting any charge other than the rates set forth in its tariff filed with the DPU. The trial judge found that, with respect to the intrastate portion of the agreement, PCS's claims under §§ 14 and 17 of the statute were the functional equivalent of the claims filed by ACC under §§ 201 and 202 of

---

[16]We think the decision would not be different were we to apply Massachusetts rules respecting illegal performance of an otherwise legal contract. "[W]e have to ask whether a consequence, beyond the one prescribed by statute, should attach, inhibiting recovery of compensation, and we agree with the judge in his negative answer to the question in the present case. To find a proper answer, all the circumstances are to be considered and evaluated: what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract (were 'the characteristics which gave the plaintiff's act its value to the defendant . . . the same as those which made it a violation . . . of law'); what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall. The vector of considerations here points in the plaintiff's favor." *Town Planning & Engr. Assocs., Inc.* v. *Amesbury Specialty Co.*, 369 Mass. at 745-746 (Kaplan, J.) (internal footnotes omitted).

the Act, and that the FCC's determination that the rates were reasonable and nondiscriminatory under the Federal law was dispositive of the State claim brought under G. L. c. 159. The trial judge further found that, as an independent matter, PCS had not made a case that the rates were either unreasonable or discriminatory. The trial judge did rule, however, that under § 19 of the statute, requiring common carriers to obtain DPU approval for rates, Yankee acted illegally in failing to do so, and in failing to comply with other DPU policies and Massachusetts law, and thus Yankee was barred from enforcing the service agreement.

Yankee argues principally that, at the time the service agreement was negotiated, and during the time when service was rendered, Yankee was not a common carrier but rather acted as a private contract carrier, and thus was not subject to the filing requirements of G. L. c. 159. We agree with Yankee's contention, and conclude that Yankee was under no legal obligation to obtain DPU approval of the rates established under the service agreement and that there was no illegality in Yankee's performance under the intrastate portion of the service agreement.

From 1984 through early 1987, while negotiating the service agreement, constructing the network, and beginning service to PCS, Yankee was acting as a private contract carrier. In the later part of 1987, as its business expanded, Yankee filed an application with the DPU seeking common carrier status. As part of its submission to the DPU, Yankee filed a proposed tariff which explicitly provided for private contract service, with negotiated rates, where, as with PCS, special construction was involved. The DPU held hearings in the summer of 1988, in which ACC participated. The hearings were held at or near the time of PCS's breach. At DPU's request, Yankee filed a copy of the service agreement with the DPU as part of its application process. The DPU recognized that Yankee, under the service agreement, provided "private network services" pursuant to a "private carrier agreement."

Yankee's certification as a common carrier was not granted until the late summer of 1989, more than a year after PCS had breached the service agreement, and service from Yankee had

ceased. As a private contract carrier, Yankee was under no legal obligation to file the service agreement with the DPU, or to obtain DPU approval for the rates. See MFS-McCourt, D.P.U. 88-229/88-252, 10 (1989) (private contract falls outside of DPU's jurisdiction). The final DPU order noted that Yankee would again file the service agreement, as an "individual case basis contract," upon Yankee's certification as a common carrier. In this regard, we agree with Yankee's contention that, by the time Yankee was certified as a common carrier, the issue whether Yankee then needed to obtain rate approval for the service agreement was moot, as the service agreement had been breached and all performance had ended.

Accordingly, we affirm the judgment of the trial judge that PCS breached the service agreement with Yankee, but reverse the trial judge's ruling that illegal performance barred recovery. We must review, then, Yankee's claim that the trial judge erred in his rulings with regard to the recapitalization of PCS and the payments made with that capital contribution.

C. *The corporate payments.* At the time PCS sold its assets to ACC in February, 1987, PCS had on its books an obligation of $2.1 million, representing advances from PII that PCS had not repaid. PCS also owed Basil $301,718.75, and Robert $352,225, for monies carried as loans from the time of incorporation.[17] PCS was then insolvent, as the proceeds from the ACC sale did not equal its indebtedness; in fact, the proceeds had been used to pay secured third-party lenders, payments that are not now in dispute. In April, 1987, Basil and Robert received $3.1 million from the sale of land owned by them individually, and unrelated to their corporations. On their accountant's recommendation, they contributed the $3.1 million to the capital of PCS.[18] There were essentially two reasons for the contribution. First, Basil and Robert had a high level of taxable income in 1987 and the contribution would enable them to gain a tax advantage from PCS's losses. As a sub-chapter "S" corporation, PCS's losses

---

[17]The difference between these payments and the amounts Basil and Robert originally loaned to PCS ($500,000 and $100,000, respectively) resulted from additional financing and side agreements between the brothers.

[18]There is no dispute that payment of the $3.1 million to PCS constituted a contribution of capital, and that it was made in equal shares by Basil and Robert.

could be passed through directly to Basil and Robert as stockholders. However, stockholders could claim losses only to the extent of their tax basis, i.e., their investment in the corporation. Prior to the contribution of this additional capital, that amount was $100. Second, there was concern that the Internal Revenue Service (IRS) might consider the unpaid $2.1 million in advances from PII to PCS to be taxable dividends from PII to Basil and Robert, if the advances were forgiven. In April of 1987, $2,080,000 of the brothers' $3.1 million contribution was used to repay PII for the unpaid advances, and approximately $225,000 was used to pay general creditors.[19] In August, 1987, PCS repaid the $352,225 loan from Robert, and repaid the $301,718 loan from Basil. On December 29, 1987, PCS paid Robert $175,000 in order to redeem his stock in PCS. The trial judge ruled that the latter payment to Robert, made in order to redeem his stock, was a repayment of capital, and ordered that amount returned to PCS, or made available to satisfy any judgment that Yankee might obtain. The parties do not dispute that portion of the judgment and we affirm. We consider whether the remaining payments were proper, in light of the Uniform Fraudulent Conveyance Act, G. L. c. 156B, § 61 (in force at the time of these transactions), and of common-law principles.[20]

The Massachusetts Uniform Fraudulent Conveyance Act (MFCA), formerly G. L. c. 109A,[21] confers jurisdiction to set aside conveyances made without fair consideration, or with actual intent "to hinder, delay, or defraud either present or future creditors." MFCA, §§ 4, 5 & 7. "It provides a method by which the frustration of [creditors'] claims by a conveyance may be avoided." *Jorden* v. *Ball*, 357 Mass. 468, 470 (1970).

---

[19]Yankee does not question the propriety of the payment to general creditors.

[20]Although the payments were made over a period of several months, there is no question that they were made in accordance with a predetermined plan, the implementation of which resulted in PCS once again becoming insolvent.

[21]The Massachusetts Uniform Fraudulent Conveyance Act (MFCA) was repealed in its entirety by St. 1996, c. 157. The Legislature replaced MFCA with a new § 109A, the Massachusetts Uniform Fraudulent Transfer Act (MFTA). This case is governed by the prior statute, MFCA. The MFTA is not to be applied retroactively. *First Fed. Sav. & Loan Assn. of Galion, Ohio* v. *Napoleon*, 428 Mass. 371, 373 (1998). We refer to the operative statute here as MFCA, followed by the section number.

See *Blumenthal* v. *Blumenthal*, 303 Mass. 275, 278 (1939). It is undisputed that Yankee is a creditor under the definition set forth in MFCA, § 1 (" 'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent").

It is further undisputed that the payments made by PCS from the $3.1 million contribution was a conveyance. Section 1 of MCFA defines conveyance as including "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." In addition, the payments by PCS, especially the first payment to PII in the amount of $2,068,000, rendered PCS insolvent according to the definition in MFCA, § 2 ("A person is insolvent within the meaning of this chapter when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured"). PCS had ceased operations, and after the eighteen-month guarantee, there would be insufficient funds to pay the balance of the debt remaining on the service agreement. "Fair consideration," under MCFA, § 3, includes the satisfaction of an antecedent debt. If a conveyance is made without fair consideration, and the conveyance is made by one who is or would thereby be rendered insolvent, the conveyance is fraudulent as to creditors without regard to actual intent. MFCA, § 4. A conveyance made without fair consideration is fraudulent as to creditors, without regard to actual intent, if the person making the conveyance is engaged or is about to engage in a business or transaction and the conveyance would leave the property remaining with an unreasonably small capital. MFCA, § 5. "When the person making the conveyance intends or believes that he will incur debts beyond his ability to pay as they mature," the conveyance is fraudulent as to both present and future creditors. MFCA, § 6. Where there is actual intent to hinder, delay or defraud either present or future creditors, the conveyance is fraudulent

without regard to whether there was fair consideration. MFCA, § 7.[22]

The creditor must show not only that the transfer was made with fraudulent intent, but also that the creditor suffered some harm, such as a resulting diminution of the debtor's assets. *Richman* v. *Leiser*, 18 Mass. App. Ct. 308, 312 (1984). *Ferrari* v. *Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 139 (Bankr. D. Mass. 1992). Where a conveyance is fraudulent as to a creditor, the creditor may, among other remedies, have it set aside to the extent necessary to satisfy his claim. MFCA, § 9. Where the claim has not yet matured the creditor may proceed in the Superior Court against any person against whom he might have proceeded had the claim been mature, and the court may take action to "[r]estrain the defendant from disposing of his property" or may "[a]ppoint a receiver to take charge of the property," among other remedies. MFCA, § 10. Here, had Yankee known of the $3.1 million capital infusion, it might have petitioned under MFCA, § 10, for relief on the portion of its claim not yet matured.

While the MFCA attacks the transfer itself, G. L. c. 156B, § 61, attaches liability to directors who vote for distributions to shareholders; if the corporation is insolvent or is rendered insolvent by the distribution, then even if the distribution is authorized by the by-laws, the directors become liable to the corporation to the extent that the corporation is rendered insolvent. The purpose of the statute is to prevent distributions that are prejudicial to creditors of the corporation. *Brigham* v. *M & J Corp.*, 352 Mass. 674, 680 (1967).

Where Massachusetts law is silent, we look to the law of other jurisdictions that have adopted provisions analogous to the MFCA, "and to decisions construing analogous provisions of the Bankruptcy Code." *Ferrari* v. *Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. at 130. See *Moody* v. *Security Pac. Bus. Credit*, 971 F.2d 1056, 1063 (3d Cir. 1992). We consider each payment against the background of these various statutes and the common law.

---

[22]MFCA, § 7, provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."

1. *Payment of $2,086,000 to PII.* Yankee first argues that the advances from PII to PCS constituted an equity investment, which Basil and Robert caused to be redistributed principally to themselves. Yankee bases its argument on three grounds: (1) the agreement between PCS and PII concerning the advance from PII describe these funds as "working capital"; (2) the agreement between PCS and PII granted PII an option to acquire all of PCS's stock from Basil and Robert; and (3) the possibility, a concern expressed by Basil and Robert, that the IRS would treat the amount as a dividend to them if the "loan" was written off by PII. In the alternative, Yankee argues that, even if the amount is treated as a loan, the repayment by PCS was still not made for "fair consideration," because the repayment was made for the benefit of Basil and Robert (who were directors and shareholders of both PCS and PII) at the expense of other creditors, and thus PCS's payment to PII should be subordinated to Yankee's claim under the provisions of MFCA, §§ 4 and 5. Yankee further contends that the payment to PII was made with the actual intent to hinder, delay, or defraud creditors, in contravention of MFCA, § 7, and thus the payment was proscribed without regard to whether "fair consideration" existed for the transfer.[23]

Yankee argues that, under authority of *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. 280, 288-289 (1934); *Burke* v. *Marlboro Awning Co.*, 330 Mass. 294, 300 (1953); and *Seder* v. *Gibbs*, 333 Mass. 445, 452 (1956), Basil and Robert, as directors of PCS, cannot pay monies to themselves, even if for antecedent debt, if the corporation is about to become, or is,

[23]Yankee urges, on authority of *Sanguinetti* v. *Nantucket Constr. Co.*, 5 Mass. App. Ct. 227, 228 (1977), that we draw our own conclusion with respect to the question of PCS's actual intent in making the transfer, as the trial court merely opined, without reference to the record and without making subsidiary findings, that the transfer was not made with the intent to hinder, delay, or defraud Yankee. Our review of the record suggests that the judge's ultimate finding in this regard was based upon his subsidiary finding, amply supported by the evidence, that the transfer was made to avoid the possibility that forgiveness by PII of the loan would be considered a taxable event. As we defer to the trial judge's findings unless clearly erroneous, we reject Yankee's suggestion that a review of the record provides sufficient support requiring us to infer actual intent to defraud here. While we might take a different view of the evidence, we cannot say that the trial judge's finding was clearly erroneous.

insolvent, and that, as they were directors, stockholders, and the controlling officers in charge of both PCS and PII, the payment was for their benefit, as directors of PCS. The defendants counter that the amounts advanced by PII constitute legitimate antecedent debt, providing the "fair consideration" required to insulate the payments from the provisions of MFCA, §§ 4 & 5. PCS further contends that the *Burke* case is inapplicable to this repayment, as PII was a separate corporate entity and not a director of PCS. Finally, the defendants argue that the payment to PII was not made "with the actual intent to hinder, delay or defraud creditors," as contemplated by MFCA, § 7, but rather only to avoid certain tax consequences, as advised by their accountant.

With respect to PCS's repayment to PII, the trial judge found and ruled that (1) MFCA, § 7, did not apply, in that the capital contribution was made "only to avoid adverse tax consequences, and to take advantage of the previous PCS losses on [Basil's and Robert's] personal tax returns," and that there was thus no actual intent "to hinder, delay or defraud either present or future creditors"; (2) PCS was genuinely indebted to PII, and that the transfer to PII was "to satisfy legitimate antecedent debts," thus avoiding the consequence of MFCA, §§ 4 and 5; and (3) the rule, as set forth in *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. at 288-289; *Burke* v. *Marlboro Awning Co.*, 330 Mass. at 300; and *Seder* v. *Gibbs*, 333 Mass. at 452, was not applicable to the payments to PII. Further, with respect to PII, the judge found that as Basil and Robert were not the sole stockholders and directors of PII, and the transfer did not benefit Basil and Robert exclusively, the repayment was not subject to the rule governing repayments for the benefit of directors. We consider each of these findings and rulings.

a. *Actual intent under MFCA, § 7.* In order to find that a conveyance is fraudulent under MFCA, § 7, there must be evidence of "actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud" creditors. The burden of proof is on the creditor. *Ward* v. *Grant*, 9 Mass. App. Ct. 364, 367 (1980). See *Alabama Credit Corp.* v. *Deas*, 417 F.2d 135, 139 (5th Cir. 1969) ("Where actual fraud is alleged as the ground upon which to set aside the conveyance the burden

is upon the creditor to prove it. It is not sufficient merely to charge an intent to hinder, delay or defraud creditors. Rather, the charge must plainly show the facts which constitute the fraud"). Here, Yankee alleged actual intent to hinder, delay and defraud on the part of the defendants, but the record does not contain specific allegations or factual evidence that would permit a determination that the trial judge's finding, that there was no actual intent to hinder, delay or defraud Yankee, is clearly erroneous. Mere allegation that the transfer itself occurred is not sufficient. *Alabama Credit Corp.*, *supra* at 139. We affirm the trial judge's ruling in this regard.

b. *Fair consideration under MFCA, §§ 4 and 5.* As to whether the amount was a genuine loan, the trial judge found, and we agree, that the advances were genuine loans made to PCS from PII, and were not contributions to capital. The evidence amply supports this finding. PII and PCS signed an agreement for the advances, and PII in turn borrowed money from a lending institution in order to provide the funds. Some of the advances represented charges, ranging from $100,000 to $200,000 per year, for management and data processing services that PII rendered to PCS. Nothing in the record suggests that these services were not in fact rendered, or that their value was artificially inflated. Of the total amount, $209,000 initially was represented by a promissory note, bearing interest at nine percent per year. The balance of the funds represented advances made from time to time by PII to PCS under an "upstream" financing agreement. The agreement came after PCS had exhausted its original direct line of credit with an outside lending institution. Under the terms of the "upstream" financing agreement, PII established a line of credit at a lending institution, secured both by PII's assets and by a limited guarantee of Basil and Robert individually. PII would then borrow against the line, advancing the funds in turn to PCS.

While the business was ongoing, PCS periodically repaid portions of the advances. At one point, the amounts advanced exceeded $2.7 million, but at the time Basil and Robert contributed $3.1 million into PCS, the amount had been reduced to $2,086,000. In addition to periodically paying down the advances, PCS annually reimbursed PII for interest PII paid the

lending institution on that portion of PII's borrowing which had been advanced to PCS. These amounts varied from $250,000 to $350,000 annually. PCS in effect arranged for an additional line of credit from the lending institution through PII, after its direct lines of credit had been exhausted. The amounts advanced were for the ongoing business needs of PCS, and, while PCS's financial prospects were not bright, repayments made prior to the final liquidation of the debt did not render PCS insolvent, but permitted it to operate up to and including the time when performance began under the service agreement.

Yankee argues that the trial judge clearly erred in not disregarding PII's corporate nature, on the basis that Basil and Robert were the dominant shareholders of both PCS and PII, and that as directors and officers they played the dominant role in the management of both corporations' affairs. While there is some support for the proposition that these facts alone are sufficient to invoke the doctrine of corporate disregard, see, e.g., *In re V. Loewer's Gambrinus Brewery Co.*, 167 F.2d 318, 319 (2d Cir. 1948), "Massachusetts has been somewhat more 'strict' than other jurisdictions in respecting the separate entities of different corporations." *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 619-620 (1968). "The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. 546, 555 (2000). The usual tests to determine whether the doctrine should be applied include common ownership and control, and a certain degree of confusion in the corporate record keeping and other related financial matters.[24] The trial judge's finding in this regard, that there were other owners of

---

[24]"The relevant factors are (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud. *Pepsi-Cola Metro. Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985) (categorizing criteria as set forth in *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614 [1968]). *Evans* v. *Multicon*

PII, and that a clear corporate differentiation was kept in all transactions, supports his ultimate finding that PCS and PII were separate corporate entities.

We conclude that there was no error in determining that the payment here was made to a separate entity, for legitimate antecedent debt, and that there was "fair consideration" within the meaning of the MFCA, and thus no fraudulent conveyance. As we conclude there was no error in the judge's failure to apply the doctrine of corporate disregard, we find no error in his conclusion that, as PII was not a director of PCS, the rules stated in *Albert Richards Co.* and *Burke,* to the effect that directors may not pay themselves, even for legitimate debt, if such payment would render the company insolvent, do not apply. The finding puts this payment beyond the reach of a claim under G. L. c. 156B, § 61, as that section applies only to directors of PCS. We affirm the trial judge's ruling in this respect.

2. *Payments to Basil and Robert individually.* With respect to the repayment of the loans from the brothers, the trial judge found and ruled that it would be inequitable to require the brothers to repay over $600,000 to PCS, "given the circumstances of this case." The trial judge reached this conclusion based on his opinion that, had the brothers known that by following the advice of their accountant they would forfeit this portion of the funds gained from the sale of their real estate, they would not have recapitalized PCS, and therefore, on authority of *In re Tufts Electronics, Inc.,* 746 F.2d 915, 917 (1st Cir. 1984) (rights of creditors involved only when there has been prejudice to creditors), Yankee would have been in no better position than it would have been had the contribution not been made. Thus, Yankee suffered no prejudice.

The trial judge further ruled that, unlike the creditors in *Burke* and *Albert Richards Co.,* Yankee had every incentive and opportunity to investigate the finances of PCS, and that Yankee knew or should have known that PCS was undercapitalized and financially unsound when it entered into the service agreement. The trial judge concluded that, because Yankee was not misled or deceived regarding the financial condition of PCS, there was

*Constr. Corp.,* 30 Mass. App. Ct. 728, 733 (1991)." *Attorney Gen.* v. *M.C.K., Inc.,* 432 Mass. at 555 n.19.

"fair consideration" for the repayments to Basil and Robert, as the loans were antecedent debt. The trial judge further ruled that there was nothing unfair or inequitable about PCS's repayments of the loans to Basil and Robert, making MFCA, §§ 4 and 5, inapplicable. We look to see if, in this regard, the judge's findings and rulings were clearly erroneous, and conclude that they were.

"Whether an advance should be treated as a capital contribution to, rather than creating a debt of, the bankrupt depends to some extent on the objective intention of the contributor, and in part on whether, in particular circumstances, equitable considerations require treatment of the advance as a capital contribution." *Friedman* v. *Kurker*, 14 Mass. App. Ct. 152, 159-160 (1982). Where a corporation is formed with initial capital that is grossly inadequate to the purposes of the corporation's business, requiring immediate shareholder loans in order to operate, shareholders' so-called debt should be treated as equity capital, and given no preference over creditors in the distribution of assets. *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. at 287. See *Braddy* v. *Randolph*, 352 F.2d 80, 82-84 (4th Cir. 1965); *In re Sterling House, Inc.*, 356 F. Supp. 1113, 1116 (W.D. Va. 1973) (shareholders' so-called debt required to be treated as equity).[25] With paid-in capital of $100, there can be no doubt that PCS was "grossly undercapitalized," requiring immediate loans from the shareholders (and their immediate

---

[25]The court in *Friedman* v. *Kurker*, 14 Mass. App. Ct. at 159, suggested that recent cases seemed to recognize that undercapitalization alone, unaccompanied by inequitable conduct, might not provide a basis for subordinating claims for advances to a corporation that later went bankrupt, citing *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389, 392-394 (10th Cir. 1979), and *Matter of Multiponics, Inc.*, 622 F.2d 709, 712-722 (5th Cir. 1980). We note that *In re Mid-Town* carefully distinguished the *Braddy* and *In re Sterling House, Inc.* cases, on the basis that, in those cases, the initial capitalizations of the corporations were grossly inadequate, requiring almost immediate shareholder loans and guarantees to operate. The advances in *In re Mid-Town* had been made during the course of the corporation's business (as were the advances from PII) and not at the time of original incorporation. We do not read *In Re Mid-Town* as requiring evidence of additional inequitable conduct where there is "gross inadequacy" in the initial capitalization, coupled with immediate shareholder loans and guarantees. But see an alternative analysis predicated on the differentiation of risk and reward in *In re V. Loewer's Gambrinus Brewery Co.*, 167 F.2d at 319-320 (Hand, J., concurring).

guarantees to the bank for a line of credit) to begin operations of a business that required millions of dollars in its operation. While recent thinking suggests that we review all of the circumstances that surround the making of advances by shareholders and directors, *Friedman* v. *Kurkur, supra* at 159, these loans are still subject to special scrutiny. See *Pepper* v. *Linton*, 308 U.S. 295, 306-308 (1939) (dominant shareholders and directors dealings with corporation subject to "rigorous scrutiny," and "burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness"). We think that where the loans are indeed a substitute for capital to the extent necessary to the operation of the business, they must be treated as capital and be subordinate to claims of creditors. *Albert Richards Co., supra* at 288. Here, the careful scrutiny required by *Pepper* v. *Linton*, leaves no doubt that these loans from Basil and Robert were in effect capital contributions. Thus, a repayment of those loans, which left PCS with insufficient capital as to those who are or would become creditors, is a transfer without fair consideration, in violation of MFCA, § 4 and § 5. The plain language of the statute requires that we give no consideration to the intent behind the recapitalization of the company, and the payments made by PCS from these funds.[26]

Yankee was a continuing creditor of PCS, even though the first eighteen months of payments were guaranteed by PCC. Had Yankee known of the $3.1 million contribution and the planned disposition, even though they were being paid and had guarantees for the first eighteen months, and thus no claim had matured, they could have taken steps under MFCA, § 10, to

---

[26]We are mindful of the trial judge's distinguishing between creditor obligations arising as a result of tort rather than contract obligations. We are also mindful of his findings that when Yankee signed the contract, it was fully aware "that PCS was a fledgling company with minimal assets and a poor earnings record," and negotiated for an eighteen-month guarantee from a sound financial entity. We see no reason here to permit a preference in payment to Basil and Robert as stockholders, directors, and officers of PCS, for monies advanced in the light of the minimal capital originally contributed, in circumstances where payments from a large infusion of capital might have been stopped had Yankee had knowledge of the capital infusion and the payments. Here, the directors and officers [i.e., Basil and Robert] used their "superior knowledge" for their own benefit, to the detriment of the creditors.

forestall payouts that would render PCS again insolvent. The loan repayments to Basil and Robert, in the amounts of $301,718.75 and $352,225, with such prejudgment interest as shall be determined by the trial court, must be returned to PCS or made available for any judgment that Yankee might obtain.

3. *Payment to redeem Robert's stock.* PCS does not quarrel, nor do we, with the trial judge's ruling that the $175,000 paid to Robert for his stock was a fraudulent conveyance, as defined by the MFCA. The payment also runs afoul of G. L. c. 156B, § 61. Robert and Basil were both directors of PCS, and as such were jointly and severally liable for distributions, in redemption of stock, that rendered the corporation insolvent.[27]

D. *Other issues.* We find no merit to PCS's claim that the trial court erred by entering judgment in favor of Yankee on PCS's counterclaims. The trial judge found, and we see no clear error in the finding, that at the times alleged in PCS's counterclaim, PCS was a mere conduit for the service being rendered by and for the payments being made to Yankee. As to PCS's claim for attorney's fees incurred in Superior Court, the one-sentence mention of the issue in PCS's brief does not amount to appellate argument, and we decline to consider the issue. Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Commonwealth* v. *Vieira*, 401 Mass. 828, 841 (1988) (assertions made in footnote do not rise to level of appellate argument under requirements of Mass.R.A.P. 16[a][4]); *Commonwealth* v. *Salcedo*, 405 Mass. 346, 351 (1989) ("defendant's

---

[27]For the first time on appeal PCS suggests that, because there was no evidence that Robert and Basil voted as directors for the distributions, G. L. c. 156B, § 61, does not apply. We reject this argument. The transaction was admittedly done to secure tax benefits for Basil and Robert, and to ensure that they would not be charged with a dividend in the amount of the loan from PII. In *National Refractories Co.* v. *Bay State Builders Supply Co.*, 334 Mass. 541, 544-545 (1956), the Supreme Judicial Court held that: "The statute (predecessor to G. L. c. 156B, § 61) does not require a formal vote by a director in declaring certain dividends or in making loans to a stockholder or director. It is enough if he assented to declaring the dividend or making the loan. A director . . . cannot circumvent the statutory remedy by staying away from the meeting and thus avoid voting but receive the personal benefit of a dividend or loan." By like token, as the distributions were all for the benefit of Basil and Robert, and since as officers they took actions necessary to implement the distributions, there is a strong inference that they assented to the transactions. No formal vote was necessary to implicate liability under G. L. c. 156B, § 61.

one-sentence paragraph alleging error . . . does not rise to the level of appellate argument"); *Commonwealth* v. *Springer*, 49 Mass. App. Ct. 469, 477 (2000) (one-sentence argument that is "conclusory in nature and lacks any articulated reasoning" violates requirements of Mass.R.A.P. 16[a][4]).

E. *Damages*. The trial was conducted in two phases. Phase one, by agreement, was to settle the issues of contractual liability, and the trial court determined that Yankee should prevail on count 2 of its complaint, alleging breach of contract by PCS. In this context the trial court determined that the only funds available to satisfy any judgment here was the $175,000 paid to Robert for his stock. Without determining actual damages, the trial judge awarded Yankee that amount subject to his ultimate finding on issues reserved for phase two of the trial. Phase two of the trial involved the "regulatory" issues of the case; here the trial judge determined that, as the contract was illegal and thus void, Yankee could recover nothing. As we conclude that there was no bar to Yankee's claim in this regard, the trial court must now reach the issue of actual damages. We note that the service agreement called for immediate acceleration and payment of the entire contract price to Yankee if PCS breached the agreement. There may be issues of mitigation. We remand the matter to the trial court for further hearing on the issues of actual damages and of mitigation, with any monetary amounts awarded to be consistent with this opinion, and with the further requirement that Basil and Robert return the sums of $301,718.75 and $352,225, together with interest, to PCS, or that they make these sums available to satisfy any judgment that Yankee may obtain. In all other respects we affirm the judgment of the Superior Court.

*So ordered.*