Garsh, E. Susan, J.
Plaintiff Milliken & Company (“Milliken”) filed this action against the defendants seeking to recover an $8,754,680 trade debt owed by defendant Duro Industries, Inc. (“Duro”). Milliken seeks to recover from defendant Duro Textiles, LLC (“New Duro”) as the corporate successor to Duro. This matter is before the court on the parties’ cross motions for summary judgment on Counts I and VII of the amended complaint. In addition, the defendants have moved for summary judgment on Count VI. For the reasons discussed below, the parties’ cross motions for summary judgment are ALLOWED in part and DENIED in part, and the defendants’ motion for summary judgment on Count VI is ALLOWED.
BACKGROUND
The undisputed facts as revealed by the summary judgment record are as follows.
Duro was a Massachusetts corporation which operated in Fall River as a dyer, printer, finisher and distributor of textile products for the United States military as well as private clothing manufacturers. Milliken, one of the largest textile manufacturers in the world, was one of Duro’s primary suppliers of greige goods, the raw materials used to make textiles.
In 1997, Saunders, Karp & Megrue (“SKM”) and Carlisle Enterprises, LLC participated in a leveraged buy-out of Duro in which they purchased a majority interest in Duro from members of the Ricci family. A consortium of banks led by Bank of America as agent (the “Bank Group”) helped to finance the purchase by providing a $60,000,000 term loan commitment, a $45,000,000 revolving credit commitment, and a $20,000,000 fronted revolving facility participation. Duro entered into a Credit Agreement and a Guarantee and Collateral Agreement dated October 31, 1997, in which Duro pledged all of its personal and real property assets to the Bank Group in exchange for the Bank Group commitments. On November 10, 1997, Bank of America filed UCC Financing Statements evidencing the Bank Group’s security interests in all of Duro’s personal property assets. In addition, Bank of America recorded mortgages on Duro’s real property. Following the 1997 transaction, SKM and Carlisle held eighty percent of the equity interest in Duro and the Riccis held twenty percent.
By 1999, Duro was experiencing financial problems due to a downturn in the United States textile industry, and by 2000, Duro was in default on its loan covenants. In December of 2000, Duro underwent a capital restructuring, entering into an Amended and Restated Credit Agreement with the Bank Group that reduced the total bank debt from $85 million to $46 million. On December 29, 2000, the Bank Group, Duro, the Riccis, and SKM and Carlisle (through an entity known as Duro Holdings LLC) entered into the Recapitalization Agreement. The Bank Group, Duro, SKM, Carlisle and the Riccis also entered into an Amended and Restated Shareholders Agreement. As a result of this restructuring, the Bank Group received fifty-one percent of the equity in Duro, and Duro Holdings LLC and the Riccis held the remaining forty-nine percent.
Under the Amended and Restated Shareholders Agreement, the Bank Group, SKM, Carlisle and the Riccis agreed to vote their shares so that the Bank Group selected three of Duro’s six directors and SKM and Carlisle selected three, provided that, under certain conditions, one of the three would be Edward Ricci. The Bank Group selected Stanley Frieze, Larry Himes (“Himes”)[2] and Anthony Samo as directors. The other Duro Board members were John Megrue, David Cañedo and Edward Ricci.
In March of2000,' Milliken was aware that Duro was behind in its payments, suffering substantial losses, missing its financial projections, in default of its loan covenants to its secured lenders, and operating with its revolving line of credit suspended. Milliken also knew that Duro was experiencing quality and delivery problems and had lost a substantial portion of its military business at a time when the greige fine goods business as a whole was beginning to unravel as a result of increased competition from Asia. Milliken decided at that time not to increase its exposure to Duro above $2.5 million.
Defendant Patriarch Partners, LLC (“Patriarch”) is a lender asset manager that purchases and develops portfolios of distressed secured debt. Defendant Lynn Tilton (“Tilton”) is the principal of Patriarch. Patriarch’s business model seeks to restmcture or reorganize the greater proportion of the companies in its funds’ portfolios to allow borrowers the time, liquidity, and strategic support to turn their operations around. Defendant Ark CL02000-1,[3] Limited (“Ark I”) is one of the investment funds established by Patriarch, and Patriarch is its collateral manager. In December of 2000, Duro was close to insolvency. On December 28, 2000, Ark I purchased Fleet’s twenty-nine percent interest in the Bank Group’s senior secured debt of Duro.
In 2001, Milliken was working on a secret project named “Project Conceal” to develop a camouflage-dyed nylon product to compete with Duro’s military product. The military business was very lucrative because textiles for the military are subject to import restrictions based on national security concerns. Milliken *511 hoped to have its product commercialized by the third quarter of 2001. Milliken projected that Project Conceal could have a forty percent profit margin, potentially higher than that earned on its fine greige goods business with Duro, and earn $25 million in revenue for Milliken by 2005.
In the spring of 2001, Milliken learned that the Balsón-Hercules Division (“Balsón”), its largest greige fine goods customer, was for sale. At that time, Balsón had an aging receivable of $3.5 million with Milliken. Milliken was concerned that, if Balsón did not survive, it would hurt Milliken’s business. Milliken helped finance Duro’s acquisition of Balsón by providing a $2 million unsecured note, despite the fact that Duro was $1 million past due on its debt to Milliken at the time. Further, in May of 2001, Milliken agreed to extend Duro’s payment terms to sixty days, a term it had never extended to any other customer. By June of 2001, Duro had purchased Balsón.
By September 19, 2001, Duro owed Milliken $9 million and was paying Milliken on ninety-day terms, and, by October 11, Duro owed Milliken almost $10 million in unsecured trade debt. By November 6,2001, Milliken’s accounts receivable had aged to the point where more than $3 million of the $9.6 million owed was past due on Duro’s already extended credit terms. By December 19, 2001, Duro’s payments to Milliken were running between forty and sixty days past the agreed-upon sixty-day term. By March of 2002, Milliken was “treading water” on its debt from Duro, receiving payments that were not sufficient to reduce receivables or prevent their further aging.
In April of2002, Duro was in breach of its EBITDA[4] covenant with the Bank Group. By May, Duro was over -advanced on its revolving line of credit by approximately $4.5 million and, therefore, was in default under the December 21, 2000 Amended and Restated Credit Agreement. In addition, Duro was missing its sales, gross profit, EBITDA and EBIT projections and operating at a loss. In May of 2002, Duro owed $41.7 million to the Bank Group. On May 31, 2002, Patriarch prepared and submitted a report to the Bank Group that valued Duro’s assets at $16 million based either on an orderly liquidation or asset-based refinancing.
Defendant Ark Investment Partners II, LP (“AIP”) is a limited partnership investment fund that was established to make “add-on” purchases of additional lender interests in borrowers that are in other Patriarch managed funds.[5] AIP is an equity investor in Ark I. In May of 2002, AIP offered to purchase the Bank Group’s seventy-one percent interest in Duro’s secured debt for $11,314,285.71. On June 18, 2002, Duro submitted its own part-cash offer to buy out the Bank Group, contingent on Duro’s obtaining asset-based financing for the purchase. On June 21, Policano & Manzo delivered to the Bank Group an analysis indicating that the orderly liquidation value of Duro’s operating assets was $23.1 million, not including approximately $15 million in property, plant and equipment.
On June 25, 2002, the Bank Group rejected AIP’s offer to purchase its interests in the Duro loans, rejected Duro’s buy-out offer, and directed Duro’s management to begin a liquidation of the company immediately. Duro retained bankruptcy counsel, and Patriarch offered to provide debtor-in-possession financing and exit financing upon emergence in the event that Duro wanted to put together a bankruptcy plan. Tilton told Duro president Himes that Patriarch had no interest in liquidating Duro, and if Patriarch could buy out the Bank Group’s interests, she intended to try to obtain a consensual restructuring of Duro. Himes proposed that Duro pay down the outstanding secured debt by $2 million, and the Bank Group agreed to sell its interests in the secured debt to AIP based on an agreement to distribute the $2 million pay down to Bank Group members other than Ark I.
By July 12, 2002, Milliken’s credit manager opined that if Duro were liquidated or declared bankruptcy, its unsecured creditors, including Milliken, would recover nothing. Duro owed Milliken approximately $8,580,565 for materials at that time. On July 15, AIP paid $11.376 million to buy out the non-Ark I members of the Bank Group by purchasing their seventy-one percent interest in Duro’s secured loans and its equity. After the $2 million pay down, Duro owed approximately $38.6 million on the term loan and revolver. Following the buy-out, Ark I and AIP (“the Ark Lenders”) collectively held a first-priority, perfected security interest in all of Duro’s assets and had a fifty-one percent stock ownership interest in Duro.[6] However, the Ark Lenders did not select or replace any Duro directors. In July of2002, Milliken wrote off $2.5 million of Duro’s debt as uncollectible.
On August 23, 2002, Milliken filed a lawsuit in New York to collect on its unsecured trade debt with Duro. That same day, Duro’s Board voted to file for Chapter 11 bankruptcy in Massachusetts, with Patriarch dictating its bankruptcy strategy. The purpose of the bankruptcy was to effectuate a sale of Duro as a going concern under section 363 of the Bankruptcy Code within ninety days after the bankruptcy filing. The Ark Lenders provided approximately $3.7 million in debtor-in-possession financing to Duro. Milliken, the chair of the unsecured creditors’ committee, strongly objected to a proposed agreement between the Ark Lenders and Duro’s unsecured creditors that would have paid unsecured creditors $1 million up front and a portion of the proceeds of a Section 363 bankruptcy sale of Duro’s assets in excess of $32 million. On September 26, 2002, Duro’s bankruptcy case was dismissed by consent. In September of2002, Milliken wrote off eighty percent of Duro’s debt as uncollectible; *512 it planned to write off the remainder of the debt over the next two periods.
On September 30, 2002, Ark I and AIP formed New Duro as a Delaware limited liability company with its corporate headquarters and principal place of business located in Fall River.[7] The manager of New Duro is Duro Textiles Management, Inc., a wholly owned subsidiary of Ark I and AIP. Ark I made a twenty-nine percent capital contribution of $580 to New Duro while Duro Textiles Management, Inc. made a seventy-one percent capital contribution of $ 1,420.[8] New Duro did not have any other cash or liquid assets. New Duro’s limited liability company agreement was signed by Tilton as manager of Patriarch on behalf of Ark I, Tilton as President of AIP, and Tilton as President of Duro Textiles Management, Inc.
Patriarch decided to hold a foreclosure sale pursuant to Section 9-601 of the Massachusetts Uniform Commercial Code to buy Duro’s assets and enable the company to continue its operations without interruption as a going concern. Marketing efforts for the sale were limited to publication of notice of the October 18 sale in the Boston Globe and certain other Sunday newspapers on September 29, 2002. Patriarch was concerned that if Duro’s customer base learned of the foreclosure sale, they might stop conducting business with Duro, injuring the going concern value New Duro was to acquire. Prior to the October 18 sale, New Duro made arrangements to transfer Duro’s insurance policies to its own name, obtain an assignment of Duro’s lab certifications and environmental permits, and succeed to Duro’s collective bargaining agreements.
At 1:15 p.m. on October 18, the Ark Lenders conducted an Article 9 foreclosure sale of some of Duro’s personal property.[9] The entire sale lasted less than eight minutes, and the only bidder was New Duro, which bid $26.2 million. In the opinion of Israel Shaked, a professor of finance and economics who was hired by Patriarch, the fair market value of Duro’s assets on October 18, 2002 was less than $17.6 million. Milliken has never attempted to undertake a valuation of Duro as a going concern as of October 18, nor does it know what a commercially reasonable sale of Duro’s assets, more extensively marketed, would have yielded, nor whether that amount would have produced proceeds in excess of the secured claims.
The Ark Lenders funded New Duro’s purchase of Duro’s assets by lending New Duro $22.5 million and extending a $4 million revolving credit facility, as set forth in a Credit Agreement and Omnibus Pledge and Security Agreement. The Ark Lenders applied the $26.2 million from the foreclosure sale, less expenses, to reduce Duro’s secured debt to them. By October 18, Duro owed the Ark Lenders in excess of $41 million. Patriarch recorded an all asset security interest in New Duro’s assets with the Delaware Secretary of State the same day as the foreclosure sale. A month after the foreclosure sale, the Ark Lenders projected that Duro could reach $8 million in EBITDA in four years, with an exit value of $32 million and, thus, two to four million dollars in profit for them.
On October 18, Duro filed an amendment to its articles of organization changing its name to “Chace Street, Inc.” Duro, operating as Chace Street, leased to New Duro all its real estate and improvements in Fall River, including Duro’s principal place of business at 110 Chace Street. At the 2002 annual meeting, Duro’s Chairman of the Board, David Cañedo, stated that Duro intended to deed its real estate to New Duro within ninety days. However, said real estate transaction has not occurred to date; Chace Street remains in good standing as a Massachusetts corporation and continues to own real property as well as retaining the right to recover tax refunds.[10] Nonetheless, Chace Street has no offices or employees.
Duro’s President and CEO, Larry Himes, became the President and CEO of New Duro.[11] The other Duro directors, Stanley Frieze, Anthony Samo, John Megrue, David Cañedo and Edward Ricci, do not have any involvement in the management of New Duro, nor do they have any ownership interest in New Duro, Ark I or AIP. Neither Duro Holdings, LLC (the SKM/Carlisle entity) nor the individual stockholders as defined in the Recapitalization Agreement have any interest in New Duro, Ark I or AIP.
One of the names through which New Duro conducts business is “Duro Industries, Division of Duro Textiles, LLC.” New Duro operates at 110 Chace Street in Fall River, Duro’s former business location. New Duro’s operations include the same dyeing, coating, printing, finishing and distributing of fabric and textile products performed by Duro. New Duro has essentially the same process capability as Duro did and continues to sell the same product lines. New Duro employed all of Duro’s employees as of October 20, 2002 and honored all of Duro’s existing collective bargaining agreements. At least ninety percent of New Duro’s current employees formerly worked for Duro. New Duro has honored certain of Duro’s contracts, including contracts with American Management Systems, Inc., W.L. Gore and Associates and the Israeli Ministry of Defense, and has assumed some of Duro’s equipment leases. New Duro paid off Duro’s existing debt to the New England Gas Company, AT&T and several attorneys. New Duro uses Duro’s former telephone number and answers incoming calls with “Duro.”
On November 12, 2002, a New York court entered a default judgment in favor of Milliken against Duro in the amount of $8,754,680.11.
Milliken’s first amended complaint, filed on December 23, 2002, seeks to hold New Duro liable for Duro’s unsecured debt to Milliken and asserts several other claims. Count I of the amended complaint asserts a claim for relief based upon successor liability; Count II alleges breach of fiduciary duty by Duro’s officers *513 and directors; Count III alleges negligence against those officers and directors; Count IV alleges that Patriarch, Tilton and New Duro aided and abetted the breach of fiduciary duty by Duro’s officers and directors; Count v. alleges civil conspiracy by Duro’s officers and directors, New Duro, Duro, Patriarch and Tilton; Count VI alleges violation of General Laws Chapter 93A; Count VII seeks a declaratory judgment under theories of successor liability, piercing the corporate veil, loan recharacterization and equitable subordination. Finally, Count VIII asserts a complaint to domesticate the foreign judgment against Duro.[12] The defendants and Milliken each have filed motions for summary judgment on Counts I and VII of the amended complaint. In addition, the defendants seek summary judgment on Count VI.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R-Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Fiesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Cross Motions for Summary Judgment on Successor Liability
Generally, when one company purchases the assets of another, the purchaser does not thereby acquire the debts and liabilities of the seller. Cargill, Inc. v. Beaver Coal&CM Co., Inc., 424 Mass. 356,359 (1997); McCarthy v. Litton Industries, Inc., 410 Mass. 15, 21 (1991). There are four exceptions to this rule: liability may be imposed on the purchasing corporation where the purchaser impliedly or explicitly agrees to assume the liability of the seller, where the transaction is fraudulently entered into to avoid liability, where the transaction amounts to a de facto merger, or where the purchasing corporation is a mere continuation of the selling corporation. Cargill Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. at 359; McCarthy v. Litton Indus., Inc., 410 Mass. at 21. The public policy behind these exceptions is the fair remuneration of creditors. Cargül Inc. v. Beaver Coal & CM Co., Inc., 424 Mass. at 362.
Harm to Milliken
The defendants contend that Milliken cannot recover as a matter of law under any theoiy of successor liability because it has failed to show that it was harmed as a result of the foreclosure sale. They argue that because Duro’s assets indisputably were worth less than the Ark Lenders’ secured debt, the foreclosure sale, as a matter of law, did not injure Milliken because its unsecured debt was uncollectible. The defendants’ argument is not persuasive. One of the benefits of ownership is the future potential of the owned entity to make a profit. Judgment debtors, such as Millikin, have many years to execute on their judgment. See G.L.c. 260, §20 (judgment is presumed to be paid and satisfied twenty years after it is rendered); Brown v. Greenlow, 330 Mass. 88, 90 (1953) (presumption created by c. 260, §20 is rebuttable and does not create a bar to action on a judgment). Their ability to do so is foreclosed by a transfer that leaves shareholders with an unencumbered equity interest. Indeed, had the owners of Duro, who were in the business of turning poorly performing operations around, not expected to be able to continue operating Duro as a going concern and by so doing make a profit, the asset purchase would not have taken place. Bankruptcy, with all creditors entitled to the protections of the Bankruptcy Code and all actions taken vis-a-vis the bankrupt corporation supervised by the Bankruptcy Court, is an acceptable mechanism for shedding debt. That route was not employed.[13] Similarly, a secured creditor can force a foreclosure sale to a third party and thereby recoup all the proceeds of that sale if its debt exceeds the selling price and, by so doing, cut off the unsecured creditors’ rights to proceed against the purchaser. But when the owner of the selling corporation and its secured creditor are one and the same, to allow, by the mechanism of a foreclosure sale, the owner to avoid paying its creditors without losing any control of the potential future profitability of the business would be to permit precisely what the successor liability exception is intended to prevent.
The defendants’ reliance on Ed Peters Jewelry Co. v. C&J Jewelry Co., 51 F.Sup.2d 81 (D.R.I. 1999), aff'd, 215 F.3d 182 (1st Cir. 2000), for the proposition that Milliken must be able to demonstrate that the assets of Duro exceeded Duro’s secured debt is misplaced. That court rejected an unsecured creditor’s attempt to recover its debt from the purchaser on the mere continuation theoiy of successor liability on the sole ground that the creditor had failed to prove an essential element of that claim, namely that there was inadequate consideration for the asset transfer, not on the basis that the secured debt exceeded the selling corporation’s assets. Id. at 95.[14] It was only in discussing the independent claim for successor liability based on fraud that the court reasoned, in part, that the plaintiff had failed to prove that claim because of its inability to demonstrate that, prior to the transfer, it had any hope of recovering from the selling corporation on the debt in view of the fact that the corporate assets were encumbered by the secured lender in their *514 entirety. Id. at 98. Such reasoning is consistent with the principle that to make out a claim for fraud, the plaintiff must show reliance on the fraud to its damage E.g., Barrett Assoc., Inc. v. Aronson, 346 Mass. 150, 152-53 (1963). Here, however, Milliken’s successor liability claims are based not on fraud but rather on the de facto merger and mere continuation theories.
Defendants also rely on language in Cargo Partner AG v. Albatrans Inc., 207 F.Sup.2d 86 (S.D.N.Y. 2002), aff'd, 352 F.3d 41 (2d Cir. 2003), to the effect that creditors run the risk that the company to which they extend credit may be unable to pay its debts and are not entitled to a windfall by increasing the funds available compared to what would have been available if no sale had taken place. Id. at 112. That language, however, appears in the context of the court choosing not to broaden the de facto merger exception to allow recovery where there was no continuity of ownership, as has been done by some courts in the area of products liability. Id. at 109-12. The court prefaced the wording relied upon by the defendants with the following statement:
The reasons for imposing expanded successor liability in the area of products liability are not germane to the claims of trade creditors. Expanded successor liability in products liability cases was based on the underlying policy of ensuring that there is a responsible source to pay for the victim’s injuries.
Id. at 111. Thus, the court declined to allow a contract creditor to recover from a successor on a de facto merger theoiy where there was no continuity of ownership. Here, by contrast, Milliken seeks to recover on traditional theories of de facto merger and mere continuation that include proof of continuity of ownership.[15] Allowing recovery on the theory of successor liability gives Milliken no windfall.
Finally, the defendants attempt to buttress their argument that Milliken cannot recover by citing to the law of fraudulent conveyance. To recover under the Massachusetts Uniform Fraudulent Transfer Act, Chapter 109A, a creditor must prove that it suffered harm from the transfer, such as the diminution of the debtor’s assets. Yankee Microwave, Inc. v. Petricca Communications Systems, Inc., 53 Mass.App.Ct. 497, 516 (2002); Richman v. Leiser, 18 Mass.App.Ct. 308, 312 (1984). If a creditor “could not have reached the property before the conveyance, it follows that the conveyance itself could not have been fraudulent as to him.” Richman v. Leiser, 18 Mass.App.Ct. at 312. Fraud is only one of four separate exceptions to the general rule that a purchaser of assets does not acquire the debts of the seller. Cargill, Inc. v. Beaver Coal & Oil, Inc., 424 Mass, at 359. As already noted, Milliken is not proceeding on a fraudulent conveyance theory; rather, it is proceeding on the theoiy that New Duro, as the mere continuation of Duro, is responsible for Duro’s corporate debts. Cf. In re Acushnet River & New Bedford Harbor Proceedings, 712 F.Sup. 1010, 1015 (D.Mass. 1989) (de facto merger doctrine is a judge-made rule that rests on general principles of equity and exists independent of any particular cause of action).
None of the Massachusetts cases recognizing the de facto merger and mere continuation exceptions hold that recovery thereunder is barred where the plaintiff is an unsecured creditor and the predecessor’s assets are worth less than its secured debt at the time of the sale. Under Massachusetts law, imposition of successor liability does not depend on the status of a particular creditor as secured or unsecured or on whether the assets of the predecessor coiporation were sufficient to pay all its outstanding debts; rather, the analysis focuses on whether one company has become another for purposes of its corporate debt. See Coastal Oil New England, Inc. v. Citizens Fuels Corp., 9 Mass. L. Rptr. 708, 1999 WL 140139 at *6 (Mass.Super.Ct. March 5, 1999), aff'd, 55 Mass.App.Ct. 69, rev. den., 437 Mass. 1106 (2002). The harm addressed by successor liability grounded upon mere continuation or de facto merger is the elimination of corporate debt while allowing the seller’s shareholders to retain their interest in the transferred assets through ownership of the purchasing corporation. The exceptions recognize that in such cases the form of the transaction does not accurately reflect its substance; therefore all the unencumbered assets of the “new” corporation are available to creditors of the “old” corporation, including any future unencumbered assets. The de facto merger/mere continuation exceptions prevent creditors such as Milliken from losing their potential to recover from a debtor in the future and their concomitant right to wait to see if the debtor’s financial condition improves. The de facto merger/mere continuation factors do not preclude a creditor from seeking recoveiy against a successor by virtue of the debtor’s financial condition at the time of the sale. Milliken was harmed by losing its right, as a creditor, to wait to see if the debtor’s circumstances improve. Accordingly, the defendants are not entitled to summaiy judgment on the basis of lack of harm.
Factors Warranting Imposition of Successor Liability upon New Duro
Milliken seeks to impose liability upon New Duro under both the de facto merger and mere continuation exceptions. The terms “de facto merger” and “mere continuation” are often used interchangeably and, in practice, appear to refer to the same concept. National Gypsum Co. v. Continental Brands Corp., 895 F.Sup. at 336. See also In re Acushnet River & New Bedford Harbor, 712 F.Sup. at 1019 n.15 (noting that distinction between de facto merger and mere continuation exceptions is more apparent than real, with de facto merger exception subsuming the mere continuation exception). De facto merger usually is applied where the ownership, assets and management of one corpo *515 ration are combined with those of another pre-existing entity, while a mere continuation most often is found where the owners of a selling entity set up the buyer in order to continue the business under a new form. National Gypsum Co. v. Continental Brands Corp., 895 F.Sup. at 336.
Factors in determining whether to characterize an asset sale as a de facto merger are whether there is a continuation of the seller’s enterprise with continuity of management, personnel, physical location, assets and general business operations; whether there is continuity of ownership; whether the seller ceases its ordinary business operations and liquidates as soon as practically possible; and whether the purchasing corporation assumes those obligations of the seller necessary for the uninterrupted continuation of the seller’s normal business operations. Cargill Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass, at 360; Coastal Oil New England, Inc. v. Citizens Fuels Corp., 55 Mass.App.Ct. 69, 72, rev. den., 437 Mass. 1106 (2002). No single factor is necessary or sufficient to establish a de facto merger. Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. at 360.
Similarly, the mere continuation theory envisions a reorganization transforming a single company from one corporate entity into another, so that the purchasing corporation is merely a “new hat” for the seller. McCarthy v. Litton Industries, Inc., 410 Mass, at 22. See also National Gypsum Co. v. Continental Brands Corp., 895 F.Sup. at 336 (mere continuation most often found when owners of seller set up buyer with purpose of continuing business under a new form). The imposition of liability on the purchaser is justified on the theory that in substance, if not in form, the purchasing corporation is the same company as the selling corporation. McCarthy v. Litton Industries, Inc., 410 Mass. at 22. The minimum indicia of a continuation are continuity of directors, officers and stockholders, and the continued existence of only one corporation after the sale of assets. McCarthy v. Litton Industries, Inc., 410 Mass. at 23.
The defendants argue that, as Duro’s senior secured creditor, they had the legal right to foreclose on Duro’s assets in order to satisfy their debt and that their status as Duro’s majority shareholder is irrelevant. However, a UCC foreclosure sale affords an acquiring corporation no automatic exemption from successor liability. Ed Peters Jewelry Co. v. C&J Jewelry Co., 124 F.3d 252, 267 (1st Cir. 1997) (by its nature, the foreclosure process cannot preempt the successor liability inquiiy); Glynwed, Inc. v. Plastimatic, Inc., 869 F.Sup. 265, 274-75 (D.N.J. 1994). General Laws c. 106, §9-617(a)(2), (3) provides that when collateral is disposed of by a secured party after default, it discharges the security interest under which it is made and any security interest or lien subordinate thereto, and §9-617(b) provides that the good faith purchaser takes free of all such rights and interests.[16] It does not provide that the purchaser takes free of any unsecured debt. Milliken is not asserting an interest in the collateral purchased at the §9-617 sale, but is attempting to hold New Duro liable as a successor corporation under the law of successor liability. “Despite [defendants’] predictions of the gloom and doom that will descend upon the area of commercial law if the Court permits [Milliken] to proceed on its theory, nothing in the UCC supports [defendants’] argument that the [foreclosure] provides a safe harbor against successor liability claims. [Milliken] is not looking to enforce a lien on the assets that [defendants] purchased at the foreclosure sale, but is asserting a claim of successor liability. Contraiy to [defendants’] assertions, this is a distinction with a difference.” Id. at 273-74. Rather than being irrelevant, as defendants contend, their ownership interest in Duro is critical to the imposition of successor liability. If the defendants had been merely a secured lender foreclosing on Duro’s assets in order to recoup their debt and selling those assets to a third party, there would be no basis for imposition of successor liability. By virtue of their majority ownership interest in Duro, the purchase of the assets at the foreclosure sale permitted the defendants to retain control of the company and its anticipated future profitability, while increasing the likelihood of profitability by ostensibly shedding unsecured creditors such as Milliken.
The first factor relevant to the de facto merger and mere continuation exceptions is continuation of the business enterprise. It is undisputed that New Duro has continued Duro’s enterprise, conducting its textile business in substantially the same fashion as Duro, selling the same products to the same customers, and employing the same physical plant and employees. The defendants emphasize that the top-level management of Duro and New Duro are not the same because Duro was managed by a board of six directors, only one of whom is involved in the management of New Duro. Notably, as a limited liability company, New Duro lacks a board of directors. However, Himes, who was a director and then the CEO/President of Duro, is now the CEO/President of New Duro. Further, there is no evidence that the operational management of the business has changed; New Duro hired all of Duro’s employees as of the date of the foreclosure sale. Thus, on the undisputed summary judgment record, the continuation of enterprise factor is satisfied.
The second relevant factor is continuity of shareholders. Typically, this factor is satisfied when the purchaser exchanges its own stock as consideration for the selling corporation’s assets so that the shareholders of the seller become a constituent part of the purchaser. Cargill Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass, at 361. The defendants contend that this factor is not met because New Duro exchanged cash, not stock, for the assets it purchased. However, it would be unduly technical to limit the de facto merger *516 doctrine to asset sales made solely with the purchaser’s own stock. In re Acushnet River & New Bedford. Harbor, 712 F.Sup. at 1017 (continuity of shareholders requirement is satisfied where purchaser exchanges shares of its parent company for assets). Cf. Glynwed, Inc. v. Plastimatic, Inc., 869 F.Sup, at 277 (where there is continuity of shareholders, it is irrelevant that cash rather than stock was used to purchase assets).
The defendants also emphasize that two groups of minority Duro shareholders, the Ricci family and the SKM/Carlisle Group, did not receive any ownership interest in New Duro. Massachusetts law explicitly rejects a requirement of total identity. “[T]here is no requirement that there be complete shareholder identity between the seller and a buyer before corporate successor liability will attach.” Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass, at 361 (continuity of shareholders factor met where sole shareholder of seller acquired 12.5 shares in purchaser, with 13 shares owned by other individual, and 74.5 shares retained by purchasing corporation). Accord Kaiser Foundation Health Plan v. Clary & Moore, P.C., 123 F.3d 201, 206 (4th Cir. 1997) (where ultimate'control of predecessor and successor is the same, absolute identity of ownership is not necessaiy); Glynwed, Inc. v. Plastimatic, Inc., 869 F.Sup. at 277 (test is one of continuity, not uniformity, of ownership and that test met where three out of six individual shareholders of the two sellers, collectively holding about 35% of sellers’ stock, became three out of four shareholders in the purchasing company). Because corporate shareholders ultimately are liable for the disposition of a corporation’s assets and payment of its debts, the continuity of ownership factor focuses on whether the disputed transaction involves two distinct corporations who are strangers to one another or corporations under the same ownership and control. Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458 (11th Cir. 1985). Here, the Ark Lenders, which are ultimately controlled by Tilton through Patriarch, owned fifty-one percent of Duro and now own one hundred percent of New Duro. Although the minority owners of Duro have been eliminated, Tilton’s majority control of the business has continued uninterrupted. Duro and New Duro are not strangers but rather are both controlled by the Ark Lenders as majority owner of the former and sole owner of the latter. Accordingly, the plaintiff has established continuity of shareholders under the de facto merger and mere continuation exceptions.
The third relevant factor is whether the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible. Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass, at 360. The defendants argue that this requirement is not satisfied because Duro did not dissolve and remains a corporation in good standing. However, the mere fact that the seller’s corporate entity does not dissolve does not preclude a finding of de facto merger. Id. at 361 (formal dissolution not required where selling corporation effectively ceased its ordinary business operations and liquidated its assets); National Gypsum Co. v. Continental Brands Corp., 895 F.Sup. at 342 (formal dissolution not necessary if post-transaction assetless state makes dissolution a meaningless formality). It is undisputed that Duro ceased its ordinary business operations following the foreclosure sale and currently has no offices or employees. Although Duro, now renamed Chace Street, continues to exist as a corporation and holds real estate assets that it leases to New Duro, the summary judgment record reveals that, prior to the commencement of this litigation, such arrangement was intended to be only temporary, with Chace Street planning to transfer the real estate to New Duro within ninety days. New Duro, as lessee, has possession of all of Duro’s real estate, and Patriarch as mortgagee holds the title to that real estate. Cf. Peters Jewelry Co. v. C&J Jewelry Co., 124 F.3d at 269-70 (for purposes of whether asset transfer occurred, fact that seller did not transfer its real estate irrelevant, where real estate was transferred to separate corporation controlled by same individuals).
The final relevant factor is whether the purchaser assumes those obligations of the seller necessaiy for the uninterrupted continuation of normal business operations. Cargill Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. at 362. Here, it is undisputed that New Duro selectively paid those creditors whose services were crucial to continuing the textile operations, including the gas and phone companies, and it assumed necessaiy obligations such as insurance coverage and collective bargaining agreements.
New Duro holds itself out as the same enterprise as Duro and continues to function in the same manner with the same plant, employees and equipment, providing the same textile products and services. Duro has effectively ceased its operations and remains a mere shell. New Duro is controlled, as Duro was, by Tilton through Patriarch and the Ark Lenders. As both the senior secured lender and majority shareholder in Duro, the defendants employed the foreclosure sale to eliminate the debt of Duro’s unsecured creditors without any Bankruptcy Court oversight while keeping control of Duro and retaining its value as a going concern with the hope of future profitability. The undisputed facts of this case warrant judgment in favor of Milliken on its debt against New Duro under either the de facto merger or mere continuation theories of successor liability unless the plaintiff is precluded from obtaining such a judgment on the basis of its own unclean hands.
Unclean hands
The defendants maintain that even if Duro became New Duro for purposes of Duro’s corporate debt, New Duro is not liable for Milliken’s pre-existing debt because it is not an innocent creditor. The de facto merger and mere continuation doctrines are judge-made rules *517 that rest on general equitable principles. See In re Acushnet River & New Bedford Harbor, 712 F.Sup. at 1015. In allowing recovery under these doctrines, the court tilts in favor of an “innocent” creditor. Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass, at 362.
One who seeks equity must come with clean hands. New England Merchants Nat’l Bank v. Kann, 363 Mass. 425, 428 (1973); Fidelity Management & Research Co. v. Ostrander, 40 Mass.App.Ct. 195, 200 (1996). The court may, in its discretion, deny relief to a party who has acted inequitably, with fraud, or in bad faith relative to the matter in which relief is sought. Amerada Hess Corp. v. Garabedian, 416 Mass. 149, 156 (1993); Fidelity Management & Research Co. v. Ostran-der, 40 Mass.App.Ct. at 200.[17]
The defendants contend that Milliken should not be allowed to invoke successor liability because it has acted inequitably with respect to the debt at issue. They argue that Milliken has used Duro’s debt as a weapon to try to force Duro out of business in order to capture Duro’s share of the lucrative militaiy textile market. Bad faith in enforcing a legal right may, in some circumstances, constitute unclean hands. See Amerada Hess Corp. v. Garabedian, 416 Mass, at 156 (summaiy judgment record did not support argument that lessee seeking specific performance of option to purchase acted inequitably by exercising option in retaliation for lessor’s efforts to get lessee to remedy alleged environmental violations). Cf. Forte v. Caruso, 336 Mass. 476, 506 (1957). There is evidence in the summaiy judgment record that Milliken had a secret project to compete with Duro in the military market; Milliken helped Duro purchase Balsón thereby ballooning Duro’s unsecured debt to Milliken despite knowledge that Duro was on the brink of insolvency; Milliken initially wrote off Duro’s debt as uncollectible but then rejected Duro’s offers of a partial settlement; Milliken opposed Duro’s bankruptcy plan, which would have allowed it to continue operations, and then filed this suit to collect on the debt. A fact-finder might infer that the suit was commenced to force New Duro out of business. Although the facts may not ultimately establish unclean hands,[18] at this stage, all inferences must be drawn in favor of the defendants. So doing raises a factual issue for trial concerning whether Milliken is an innocent creditor entitled to the benefit of successor liability.
Accordingly, the undisputed facts demonstrate that, under the de facto merger/mere continuation doctrines, Duro Industries, Inc. became Duro Textiles, LLC for purposes of its corporate debt, but Milliken is not entitled, on this summaiy judgment record, to judgment in its favor against New Duro for the amount of its trade debt on Count I of the Amended Complaint. Further, with respect to Count VII of the amended complaint, Milliken is not entitled to a declaratoiy judgment concerning successor liability at this time. Cf. Fcdes v. Glass, 9 Mass.App.Ct. 570, 575 (1980) (before declaring plaintiffs title rights to property, court considered and rejected unclean hands argument). The defendants are not entitled to judgment in their favor on the successor liability counts.
Cross Motions for Summaiy Judgment on Status of Loan and Equitable Subordination
In order to enhance its likelihood of collecting its debt from New Duro, Milliken urges this court to re-characterize the Ark Lenders’ $26.5 million secured loan to New Duro as capital equity. An advance may be treated as a capital contribution to, rather than a debt of, the corporation, depending on the objective intent of the contributor and whether equitable considerations exist that require treatment of the advance as a capital contribution. Yankee Microwave, Inc. v. Petricca Communications Systems, Inc., 53 Mass.App.Ct. at 522; Friedman v. Kurker, 14 Mass.App.Ct. 152, 159-60, rev. den., 387 Mass. 1102 (1982). “Where a corporation is formed with initial capital that is grossly inadequate to the purposes of the coiporatioris business, requiring immediate shareholder loans in order to operate, shareholders’ so-called debt should be treated as equity capital, and given no preference over creditors in the distribution of assets.” Yankee Microwave, Inc. v. Petricca Communications Systems, Inc., 53 Mass.App.Ct. at 522. See also Albert Richards Co. v. Mayfair, 287 Mass. 280, 288 (1934) (undercapitalization, coupled with inequitable conduct, may provide basis for subordinating claims of shareholders for advances to corporation which later becomes bankrupt); Barrett v. Continental Ill. Nat'l Bank & Trust Co., 695 F.Sup. 66, 71 (D.Mass. 1988) (one of primary reasons for recasting shareholder loans as equity contributions is to protect non-insider creditors when assets of business are inadequate to cover their claims).
Milliken argues that New Duro was formed with only $2,000 in equity and was thus grossly undercap-italized to operate a multi-million dollar textile operation burdened with more than $26 million in debt. This argument, however, is inconsistent with Milliken’s assertion and this court’s conclusion that New Duro is not a newly-formed business but rather the mere continuation of Duro. Re-characterization of debt as equity is intended to protect creditors dealing with a newly formed business that is grossly undercapital-ized at its inception. See Hanson v. Bradley, 298 Mass. 371, 381-82 (1937) (denying re-characterization claim where creditor dealing with newly-formed undercapi-talized corporation was aware of its precarious situation and was not deceived); Yankee Microwave, Inc. v. Petricca Communications Systems, Inc., 53 Mass.App.Ct. at 523 (treating loan by shareholders as equity where creditor might have acted differently if it had been aware that company was undercapitalized and that its funds would be used to repay shareholder loans first). Here, New Duro is a mere continuation of Duro, the business that incurred debt to Milliken, and there is no evidence that Duro was undercapitalized at its inception or that Milliken was deceived as to Duro’s solvency. All the debt at issue was created prior to the loan that Milliken seeks to recapitalize. Moreover, to the *518 extent that New Duro is the result of a de facto merger with Duro, the company emerging from that merger did not begin operations with merely $2,000; rather, it possessed all the operating assets of Duro. Further, the overall amount of secured debt did not increase because the secured loan at issue was used to purchase Duro’s assets, the proceeds of which reduced Duro’s outstanding secured indebtedness. Milliken has produced no evidence of any particular circumstances warranting recharacterizion of the loan as a contribution of capital. Indeed, as a result of the loan, Milliken’s debt position has been improved. The defendants are entitled to summary judgment on the un-dercapitalization claim because Milliken has failed to present sufficient evidence to warrant treating the Ark Lenders’ $26 million loan as an equity contribution.
Milliken alternatively argues that if the Ark Lenders’ loan is not re-characterized as equity, it should be equitably subordinated to New Duro’s other debts. In ordering the distribution of assets, the Bankruptcy Court may apply the doctrine of equitable subordination where a claimant has engaged in inequitable misconduct that has resulted in injury to creditors or conferred an unfair advantage on the claimant and equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. Where a company is not in bankruptcy, however, “it need not suffer the burdens and may not claim the benefits of bankruptcy law and practice.” SFB Corp. v. Cambridge Automatic, Inc., 15 Mass. L. Rptr. 304, 2002 WL 31481078 at *3 (Mass.Sup.Ct. Oct. 1, 2002) (Billings, J.) (rejecting trade debt creditor’s request to equitably subordinate promissory note to debtor). Accordingly, there is no basis for Milliken’s claim for equitable subordination.
Defendants’ Motion for Summary Judgment on Piercing the Corporate Veil Claim
Milliken seeks a declaration piercing the corporate veil of New Duro in order to hold Patriarch and the Ark Lenders liable for New Duro’s debts. Corporations generally are regarded as separate from each other and from their respective stockholders. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968). Nonetheless, in rare cases to prevent gross inequity, it is permissible to disregard separate corporate entities and “pierce the corporate veil.” Evans v. Multicon Construction Corp., 30 Mass.App.Ct. 728, 732, rev. den., 410 Mass. 1104 (1991). Piercing the corporate veil is appropriate when there is active and pervasive control of related business entities by the same controlling persons and there is a fraudulent or injurious consequence by reason of the relationship among those entities. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass, at 619; Evans v. Multicon Construction Corp., 30 Mass.App.Ct. at 732. The corporate veil also may be pierced when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass, at 619. Twelve factors are relevant: common ownership, pervasive control, confused intermingling of business assets, thin capitalization, nonobservance of corporate formalities, absence of corporate records, no payment of dividends, insolvency at the time of the litigated transaction, siphoning away of corporate funds by the dominant shareholder, non-functioning of officers and directors, use of the corporation for transactions of the dominant shareholder, and use of the corporation to promote fraud. Attorney General v. M.C.K., Inc., 432 Mass. 546, 555 n.19 (2000); Evans v. Multicon Construction Corp., 30 Mass.App.Ct. at 733. Drawing all inferences in favor of Milliken, the defendants have not established that Milliken has no reasonable expectation of proving its piercing the corporate veil claim at trial. Accordingly, the defendants are not entitled to summary judgment on this issue.
Defendants’ Motion for Summary Judgment on Chapter 93A claim
The defendants contend that they are entitled to judgment as a matter of law on Count VI of the amended complaint, which alleges violation of General Laws Chapter 93A. Milliken alleges that Tilton, Patriarch, the Ark Lenders and Duro acted unfairly and deceptively by conspiring to engineer the sale of Duro’s assets in a manner that prejudiced its unsecured creditors, first through the bankruptcy proceedings and then through the foreclosure sale.[19]
Chapter 93A, Section 11 requires that there be a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce. Szalla v. Locke, 421 Mass. 448, 450 (1995). See also Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 23, cert. den., 522 U.S. 1015 (1997) (§11 applies only where interaction between two businesses constitutes a “commercial transaction”); Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass.App.Ct. 545, 551 (1995) (under §11 parties must be engaged in more than a minor or insignificant business relationship). A Chapter 93A claim does not lie where no commercial relationship ever existed between the parties and their only contact occurred in the context of litigation. First Enterprises, Ltd. v. Cooper, 425 Mass. 344, 347 (1997). Milliken has proffered no evidence of any commercial transaction between itself on the one hand and Patriarch, the Ark Lenders and New Duro on the other. Rather, the only dealings among these parties occurred in the course of Duro’s unsuccessful bankruptcy proceedings and the present litigation. Accordingly, Milliken cannot assert a Chapter 93A claim against these defendants.
In addition, in order to recover under Section 11, a plaintiff must show a “loss of money or property, real or personal.” G.L.c. 93A, §11. “Money” means money, *519 not time, and “property” means the kind of properly that is bought or leased, not intangibles such as security, peace of mind, reputation or personal liberty. See Tech Plus, Inc. v. Ansel 59 Mass.App.Ct. 12, 19, rev. den., 440 Mass. 1108 (2003), quoting Baldassari v. Public Finance Trust, 369 Mass. 33, 45 (1975). Milliken has failed to raise a genuine issue of material fact with respect to whether it suffered a loss of money or property as a result of the asset transfer. There has been no showing that had the defendants acted differently, Milliken would have received any money. Although Milliken’s loss of the potential to recover from Duro in the future should that entity become profitable is sufficient harm to invoke the equitable remedy of successor liability, it does not constitute a loss of money or property within the meaning of Section 11. See Mass Printing & Forms, Inc. v. RKS Health Ventures Corp., 11 Mass. L. Rptr. 755, 2000 WL 744564 at * 5 (Mass.Super.Ct. May 22, 2000) (Gants, J.) (where creditor could not establish fraudulent conveyance because transferred assets had negative value, there was no claim under c. 93A, although creditor might be able to recover in contract under de facto merger theoiy of successor liability). Cf. Williams v. Resolution GGF Oy, 417 Mass. 377, 384 (1994) (mortgagee’s failure to provide owner with accurate accounting prior to foreclosure was not a violation of c. 93A where plaintiffs never sought to exercise right of redemption and therefore suffered no harm). For this independent reason, Milliken has no reasonable expectation of establishing a violation of Chapter 93A, Section 11.
Milliken argues that even if it cannot establish that it has suffered any loss of money or property, it is nonetheless entitled to recover attorneys fees under Chapter 93A. A plaintiff cannot recover attorneys fees under Section 11 merely for identifying an unfair or deceptive act; rather, the defendant’s conduct must have had some adverse effect upon the plaintiff, even if it is not quantifiable in dollars. Jet Line Services, Inc. v. American Employers Insurance Co., 404 Mass. 706, 718(1989). An award of attorneys fees under Section 11 is also appropriate where a plaintiff succeeds in obtaining equitable relief such as an injunction, despite the absence of damages. Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 50 (1998). See, e.g., Hanover Insurance Co. v. Sutton, 46 Mass.App.Ct. 153, 175, rev. den., 429 Mass. 1105 (1999) (attorneys fees proper where court found that defendant unfairly diverted business opportunity and imposed a constructive trust and injunctive relief, although court determined that value of lost opportunity was too speculative to award damages). Milliken argues that a declaration that New Duro is liable as Duro’s successor would constitute equitable relief sufficient for an award of fees under Section 11. Chapter 93A permits the court to award “such other equitable relief, including an injunction, as it deems to be necessary and proper.” G.L.c. 93A, §11. However, in this case, a declaratory judgment concerning successor liability, if granted, will be independent of Chapter 93A and not predicated on a finding of an unfair or deceptive practice. Accordingly, even if Milliken had met the commercial relationship test entitling it to maintain a claim under Section 11 of chapter 93A, which it did not, Milliken would not be entitled to an award of attorneys fees under Section 11 by dint of securing a declaratory judgment that New Duro succeeded to the liabilities of Duro. Cf. Callahan v. Harvest Board International Inc., 138 F. Supp.2d 147, 167 (D.Mass. 2001) (plaintiff cannot succeed on §11 claim where alleged loss of money or property stemmed from separate breach of contract claim and was not attributable to unfair or deceptive act). The defendants are therefore entitled to judgment as a matter of law on Count VI of the amended complaint.
ORDER
For the foregoing reasons, it is hereby ORDERED that:
(1) plaintiffs motion for summary judgment on Count I of the amended complaint be ALLOWED in part to the extent that its claim is predicated upon the determination that, under the de facto merger/mere continuation doctrines, Duro Industries, Inc. became Duro Textiles, LLC for purposes of its corporate debt, and otherwise be DENIED insofar as a trial is necessary on the issue of whether Milliken is an “innocent creditor;”
(2) defendants’ cross motion for summary judgment on Count I of the amended complaint be DENIED;
(3) defendants’ motion for summary judgment on Count VI of the amended complaint be ALLOWED;
(4) plaintiffs motion for summary judgment on Count VII be DENIED with respect to (a) successor liability insofar as a trial is necessary on the issue of whether Milliken is an “innocent creditor” and (b) the remaining relief sought in connection with said Count.
(5) defendants’ cross motion for summary judgment on Count VII be ALLOWED with respect to (a) the claim to void the Ark Lenders’ security interest in Duro Textiles, LLC and recharacterize the loan to Duro Textiles, LLC as equity and (b) the claim for equitable subordination of the loan to Duro Textiles, LLC and the Ark Lenders’ security interest in Duro Textiles, LLC and be DENIED with respect to all remaining requests for relief in connection with said Count. It is further ORDERED and ADJUDGED that there is no basis for voiding the Ark Lenders’ security interest in Duro Textiles, LLC’s assets and recharacterizing the debt created by the loan from the Ark Lenders to Duro Textiles, LLC as equity, and Milliken is not entitled to seek in this court equitable subordination of the loan from the Ark Lenders to Duro Textiles, LLC and Ark Lenders’ security interest in Duro Textiles, LLC’s.

In December of 2001, when Larry Himes was hired as President and CEO of Duro, he became a non-voting member of the Board.

CLO stands for collateralized loan obligation.

Earnings before interest, taxes, depreciation and amortization.

AIP is a pass-through entity created for tax purposes, and Patriarch is its general partner.

he purchase did not affect SKM, Carlisle or the Riccis’ forty-nine percent equity ownership.

For tax purposes, AIP later transferred its interests in New Duro to a wholly-owned subsidiary.

These percentages corresponded to their respective interests in Duro’s senior secured debt.

On October 23, 2002, New Duro separately purchased trucks and trailers from Duro.

Both of these assets are encumbered by liens in favor of Ark I and AIP.

Himes has no ownership interest in AIP, Ark I or New Duro.

This Court (Nickerson, J.) granted Milliken summary judgment on Count VIII, and, on June 17, 2003, entered separate and final judgment on that claim pursuant to Mass.R.Civ.P. 54(b). Counts II and III of the amended complaint were dismissed by stipulation in October of 2004, and Counts IV and v. were dismissed by stipulation in February of 2005.

On June 25, 2002, the Bank Group, led by Bank of America as agent, directed Duro to begin a liquidation of the company. On August 23, 2002, Duro filed a voluntary Chapter 11 petition in the U.S. Bankruptcy Court for the District of Massachusetts. Duro moved for an order of approval of a debtor-in-possession financing package under which the Ark Lenders would provide $4 million in new financing and require Duro to sell substantially all of its assets as a going concern within 90 days under §363 of the Bankruptcy Code. The Bankruptcy Court allowed the motion on an interim basis and appointed an Unsecured Creditors Committee. The Committee objected to the motion on the ground that the Ark Lenders, as owners of Duro, were attempting to use the bankruptcy process to obtain the assets free and clear of liens, without any benefit to the unsecured creditors. An agreement was reached whereby the Ark Lenders would guarantee $1 million for the unsecured creditors plus the proceeds of certain litigation, as well as 20% of any recovery from the asset sale in excess of $32 million. The Bankruptcy Court then entered a Final Order approving the sale. On September 23, 2002, the Committee filed an emergency motion to vacate the Final Order on the ground that the Ark Lenders had obtained it by false pretenses because they never intended to conduct a fair and vigorous marketing effort but rather sought to obtain the assets for themselves without any competition. During a hearing on September 25, the Committee requested dismissal of the bankruptcy; the Ark Lenders and Duro consented to such dismissal, and the Court dismissed Duro’s bankruptcy case. On October 7, 2002, the Court issued a memorandum of decision finding that the Ark Lenders never intended to conduct a good faith, serious marketing effort, planning instead to submit their own low bid with no expectation of facing competition. The Court concluded that the Final Order could be vacated based on fraud and misrepresentations by the Ark Lenders, but noted that dismissal of the case was more appropriate. The Ark Lenders moved for reconsideration or rescission of the October 7 decision; those motions were denied. The Bankruptcy Appellate Panel for the First Circuit denied the Ark Lenders’ petition for mandamus and dismissed their appeal for lack of jurisdiction, noting that the Bankruptcy Court’s October 7 memorandum of findings and rulings was completely surplus to the unopposed dismissal order and was not itself an appealable court order. See In re Duro Indust, 293 B.R. 271 (B.A.P. 1st Cir. 2003).

Under Rhode Island law, there are five elements that must be proven to establish successor liability on a mere continuation theoiy: a transfer of corporate assets, inadequate consideration paid for those assets, the acquiring entity continues the divesting corporation’s business, there is at least one officer or director instrumental to the transaction who is common to both entities, and the divesting corporation is unable to satisfy its creditors because of the transaction. Ed Peters Jewelry, Co. v. C&J Jewelry Co., 51 F.Sup.2d at 91-92.

The defendants’ reliance on Ammend v. Bioport, Inc., 322 F.Sup.2d 848 (W.D.Mich. 2004), is similarly misplaced as that was a case involving the no-fault “continuity of enterprise” theory applicable to products liability claims. In Ammend, the court rejected successor liability for plaintiffs claims involving injury from the anthrax vaccine because the predecessor, the State of Michigan, was immune from suit; therefore, the asset sale did not deprive the plaintiffs of a remedy they otherwise would have had. Id. at 867. The defendants’ citations to successor liability cases involving a predecessor’s violation of statutory rights are also inapposite because those tort-like cases involve the imposition of liability on innocent successors to ensure that victims are not deprived of a statutory remedy by an employer’s sale of the company. See, e.g., Musikiwamba v. Essi, Inc., 760 F.2d 740, 750 (7th Cir. 1985) (one factor to be considered in imposing Title VII employment discrimination liability on innocent successor is ability of predecessor to provide relief prior to the transfer because injured employee should not be made better off by change in business); Steinbach v. Hubbard, 51 F.3d 843, 847 (9th Cir. 1995) (in considering successor liability claim involving predecessor’s violation of Fair Labor Standards Act, court noted that purpose of successor liability is not to provide windfall to employee).

IMor to the comprehensive revision of Article 9 in 2001, the substance of §9-617 appeared at §9-504(4).

Unclean hands was not pled as an affirmative defense by the defendants. Nevertheless, it may be considered. The Ark Lenders asserted the substance of such a defense throughout the discovery proceedings in this case, including the defendants’ March 3,2004 Motion to Compel Depositions. See Our Lady of the Sea Corporation v. Borges, 40 Mass.App.Ct. 484, 493 n.12 (1996). Cf. Dan B. Dobbs, Law of Remedies §2.4(2), at 92-93 (2d ed. 1993) (point of unclean hands is not that it is a defense to the defendant but that court wishes to avoid participating in inequity; thus, it can be considered sua sponte by court even if not raised by parties).

Milliken may have legitimately commenced this action in the hope, for example, that New Duro may at some point in the future be able to pay some or all of Duro’s debt to Milliken, that New Duro might be prepared to pay some of the trade debt to avoid litigating the issues raised by this suit, or that, should Milliken prevail on its successor liability theory and New Duro be put into bankruptcy, New Duro’s debt to the defendants would be equitably subordinated by the Bankruptcy Court.

Milliken’s complaint asserts several tort claims including breach of fiduciary duty and negligence by the directors and officers of Duro, aiding and abetting that breach of fiduciary duty by Tilton, Patriarch and New Duro, and conspiracy among the officers and directors of Duro and Tilton, Patriarch and New Duro. Although these counts are arguably incorporated into its Chapter 93A count, Milliken did not assert these acts as a basis for its 93A claim in either its brief opposing the defendants’ motion for summary judgment or during oral argument on the motion.