**AMERICAN TWINE LIMITED PARTNERSHIP, Plaintiff,**

v.

**Gregory F. WHITTEN, et al., Defendants.**

**No. CIV.A.02–10590 NMG.**

United States District Court, D. Massachusetts.

Sep. 20, 2005.

Bernard J. Bonn, III, Matthew A. Porter, Dechert LLP, Boston, MA, for DKSW, LLC, Gregory F. Whitten, Ruth Whitten, Counter Claimants.

Lawrence G. Green, Paul A. Leoni, JohnR. Mayer, Perkins, Smith & Cohen, LLP, Boston, MA, Christine Marie Griffin, Wolf, Block, Schorr & Solis–Cohen LLP,

Boston, MA, for American Twine Limited Partnership, Plaintiff.

## MEMORANDUM OF DECISION

GORTON, District Judge.

This case focuses upon the validity of a $10 million secured bridge loan that certain defendants and other individuals extended to a now-defunct entity of which they were also shareholders. Plaintiff, a former landlord and creditor of the subject entity, seeks to have this Court equitably subordinate the bridge loan and/or to recharacterize it as an equity investment, thereby rendering payments made pursuant to it invalid.

The parties appeared for trial before this Court, sitting without a jury, on July 25, July 26, August 15 and August 16, 2005. The Court now announces its findings of fact and conclusions of law.

## I. *Findings of Fact*

### A. Parties

1. Plaintiff, American Twine Limited Partnership ("American Twine"), is a duly organized, Massachusetts limited partnership which owns commercial property located at 222 Third Street, Cambridge, Massachusetts.

2. Defendants Gregory F. Whitten ("Whitten") and Ruth Whitten (together, "the Whittens") are natural persons who reside in Medina, Washington.

3. Defendant DKSW, LLC ("DKSW") is a Delaware limited liability company.

### B. Northern Light

i. *Early Years*

4. Northern Light Technology, LLC ("NLT I") was a Delaware limited liability company that was formed in March, 1997. The primary business of NLT I and its successors was to develop internet search engine technology.

5. On April 6, 1999, NLT I entered into a Lease Agreement with American Twine, pursuant to which NLT I leased certain space at 222 Third Street, Cambridge, Massachusetts ("the Premises"). The term of the Lease Agreement was from April 7, 1999 to November 30, 2004. Pursuant to the Lease Agreement, the annual rent was $913,600 and the annual electricity charges were $29,360, payable in monthly installments. Subsequent Amendments to the Lease Agreement modified the annual rent, electricity charges and other aspects of the lease.

6. In September, 1999, NLT I converted into a C Corporation and was incorporated in the State of Delaware. It became Northern Light Technology, Inc. ("INC"), which acquired all of the assets and liabilities of NLT I, including the obligations under the Lease Agreement, as amended.

7. INC, like many high technology companies during the internet "bubble" of the late 1990s, raised huge amounts of capital. From 1995 through December, 2000, INC conducted eight separate equity financing rounds, consecutively lettered from Series A through Series H. As a result of those rounds of financing, it raised over $110 million.

8. Also similar to many high technology companies during the same period, INC incurred prodigious expenses. Its expenses consistently exceeded its revenues and the company was never profitable. INC's net income was negative $37 million in 1999, negative $67 million in 2000 and in early 2001 the company projected that its net income would be negative $25 million that year. Although the company projected a positive net income in 2002, that never occurred.

**16**

9. In late 1999 and early 2000, INC's management and Board of Directors contemplated an initial public offering ("IPO") and began making preparations for such an offering. However, due to the burst of the internet "bubble", the prospects for INC's IPO became dismal and by the fourth quarter of 2000 it was apparent to INC that it would not be able to engage in a successful IPO in the then foreseeable future.

10. In the fourth quarter of 2000, INC was desperately in need of a cash infusion. After recognizing that an IPO was impossible, it searched for a strategic investor or partner that would invest funds in INC but was unsuccessful in that effort.

11. INC decided, therefore, to conduct another round of financing, through which it hoped to raise $25 million. From December, 2000 until January, 2001, INC conducted the Series H round of financing and, although it was unable to raise the full $25 million, it raised $15.6 million in new capital.

12. In the first quarter of 2001, INC began to negotiate a strategic partnership or acquisition arrangement with LexisNexis ("Lexis"). Management believed that INC would reach an arrangement with Lexis that would provide financial solvency to INC but that because negotiations surrounding the deal would be a lengthy process, any deal was unlikely to be completed before late spring or summer of 2001. As it turned out, the anticipated deal with Lexis never materialized.

13. Considering the amount of money INC was losing ("burning") each month, the $15.6 million raised in the Series H round of financing was expected to enable the company to survive only another six months. INC foresaw that it would need additional funding in order to survive until the expected Lexis deal could be consummated.

14. The Whittens invested in INC in the Series D, E, F, G and H rounds. They were not employees, directors or controlling shareholders of INC, had no formal relationship with INC other than as shareholders, had no contractual right to attend board of directors meetings and did not vote at them. However, Whitten and certain other investors were permitted to, and occasionally did, attend board meetings in person or by phone.

ii. *Bridge Loan*

15. In early 2001, after the Series H round fell short of INC's expectations and with INC facing the possibility of exhausting available funds before the consummation of any deal with Lexis, Whitten and David Seuss ("Seuss"), the CEO of INC, discussed the possibility of Whitten extending additional funding to INC in the form of a bridge loan. The Whittens and Seuss agreed that it would be in INC's best interests for the company to raise $10 million in additional funding.

16. The Court makes no finding regarding whether the idea of additional advances from the Whittens originated with Whitten, Seuss or someone else. Although both parties made much of that issue, the Court does not consider it to have any bearing upon the relevant issues of fact or law. Regardless of who first suggested that Whitten advance additional funds to INC, the extension of the bridge loan and the negotiation of its terms was a collaborative effort between the Whittens and representatives of INC.

17. The Whittens were willing to be responsible for a significant portion of a bridge loan (hereinafter "the Bridge Loan") but did not want to contribute the entire $10 million. The Whittens wanted, and encouraged, other investors to participate in the Bridge Loan but their offer to

make it was not contingent upon the participation of any other investors.

18. Between February and April, 2001, the Bridge Loan was negotiated between INC and the Whittens. Whitten, Seuss and the Board of Directors of INC ("the Board") considered different forms for Whitten's proffer of funds to take, including the creation of equity, debt secured by a convertible debenture with 8% interest per annum or straight debt.

19. On March 26, 2001, Whitten and Seuss proposed to the Board that the Whittens advance $5 million of a $7.5 to $10 million loan to INC. The loan was to have the following features: a 35% interest rate, interest prepaid, a one year term, no warrant coverage, no conversion rights into a defined future equity round but the principal was to be convertible into any future equity financing rounds and be secured by all of the company's assets.

20. During a Board meeting called to order on April 4 and continued on April 9 and 13, 2001, the Board approved the Bridge Loan.

21. By April 17, 2001, individuals holding the voting rights to more than two-thirds of INC's stock had also approved the Bridge Loan.

22. Richard Smith ("Smith"), Paul King ("King") and Eggert Dagbjartsson ("Dagbjartsson") (together, "the Other Investors") eventually decided to participate in the Bridge Loan. King was the Chairman of the Board, Smith was a Board member and both owned a substantial amount of stock in INC. Dagbjartsson was not a Board member but owned a significant amount of stock in INC.

23. As of April 27, 2001, none of the Other Investors had committed to participate in the Bridge Loan.

24. On May 4, 2001, the Whittens, Smith, King and Dagbjartsson (collectively, "the Investors") advanced the first payments to INC under the Bridge Loan. The Whittens advanced $5 million, Smith and King advanced $500,000 each and Dagbjartsson advanced $100,000. On the same day, the Other Investors appointed the Whittens as "Lead Investors" under the Bridge Loan and authorized them to act as representatives of the Other Investors in connection with the Bridge Loan.

25. As evidenced by related promissory notes ("the Promissory Notes"), the Bridge Loan carried a 35% annual interest rate and a one year term. Under its provisions, if INC prepaid the balance due under the loan, it became obligated to pay interest for a full year. The Bridge Loan included no warrants or convertibility features.

26. The Bridge Loan was secured by a security interest in all of INC's assets ("the Security Interest"). On May 8, 2001, the Whittens, on behalf of the Investors, perfected the Security Interest by filing a UCC statement.

27. At the time the Security Interest was perfected, the assets of INC had a total value of less than $8 million and, therefore, the value of the Security Interest did not exceed the face value of the Bridge Loan plus interest.

28. INC granted the Security Interest to the Whittens, on behalf of the Investors, for fair value and for the valid purpose of securing the Bridge Loan. The Security Interest was not granted for any improper purpose or to burden, delay or defraud any of INC's creditors.

29. The Whittens were not required to provide any further advances under the Bridge Loan. A draft Promissory Note Term Sheet sent to Board members on March 28, 2001, stated that the Whittens would loan INC a minimum of $5 million and a maximum of $10 million. Although

it is unclear whether the Term Sheet was ever finalized or executed, it is plain that the Whittens were not obligated to commit over $5 million to INC or to ensure that the total raised under the Bridge Loan equaled $10 million.

30. On May 31, 2001, Seuss informed the Board that because INC had raised only $6.1 million in the Bridge Loan, it would be out of money by the end of June. He was still hopeful that the Lexis deal would go through but realized that INC would need additional funding to survive until such a deal could be finalized. Seuss also informed the Board that Whitten was considering the possibility of purchasing INC through a new LLC in which Whitten would invest $20 million. It was noted that if that were to happen, Whitten would provide additional bridge financing.

31. On June 10, 2001, divine, Inc. ("divine") offered to purchase INC for divine stock allegedly valued at $12 million. The Board considered that offer but did not deem it bona fide because a) divine had not conducted due diligence and b) the Board thought it was likely that divine would reduce the offer when it became aware of the Bridge Loan. The Board's conclusions in that regard were reasonable.

32. At a Board meeting called to order on June 5 and continued on June 10, 2001, the Board approved the sale of substantially all of INC's assets and the assignment of substantially all of its liabilities to Northern Light, LLC ("LLC"), a limited liability company that was to be formed by the Whittens. The Board agreed that the Whittens could advance further sums under the existing Bridge Loan before the closing and believed that INC would face bankruptcy without immediate additional funding, even if the Bridge Loan was fully funded to $10 million. The Board also considered and rejected the divine proposal and reasonably concluded that selling INC's assets to LLC was in the best interests of INC's shareholders.

33. Within the following two months, the Whittens advanced further sums to INC under the Bridge Loan as follows: on June 22, $900,000; on July 6, $500,000; on July 13, $1,000,000; and on August 3, $1,500,000. In all, the Whittens advanced $8.9 million and, together with the Other Investors, advanced $10 million under the Bridge Loan.

34. The Whittens believed that there was at least a reasonable probability that INC would succeed and that the Bridge Loan would eventually be paid off, with interest.

iii. *LLC Period*

35. On August 27, 2001, the sale of substantially all of INC's assets to LLC was consummated. Whitten contributed an additional $20 million to LLC, which took the form of an equity contribution. Pursuant to the Asset Acquisition Agreement dated July 31, 2001, LLC specifically assumed the Bridge Loan, among other liabilities.

36. In January, 2002, Whitten determined that LLC was insolvent, rendering it in default under the terms of the Promissory Notes and the Security Agreement. That month, Whitten demanded payment in full of the Bridge Loan.

37. On January 15, 2002, the disinterested director of LLC reasonably voted to transfer substantially all of LLC's assets to the Investors in lieu of foreclosure. The following day, LLC made that transfer in full satisfaction of the Bridge Loan. The Investors recognized that LLC was unable to repay the Bridge Loan and accepted the assets in lieu of foreclosure.

38. On January 31, 2002, LLC gave notice to American Twine that LLC was unable to pay rent for February, 2002, and

that it would vacate the Premises. LLC failed to pay rent for February, 2002, or for the remainder of the lease term.

39. The Investors eventually sold the assets of LLC to divine in exchange for divine stock allegedly valued at $10.6 million. Not long thereafter, divine went into bankruptcy and the stock became worthless.

40. In the divine bankruptcy proceedings, Seuss bought LLC's search engine technology, its most significant asset, for $81,000.

## C. Intent

41. The objective intent of the Whittens, Seuss and the Board was that the Bridge Loan was debt rather than equity. The Bridge Loan bears many more indicia of debt than of equity and was properly characterized as a loan.

42. In e-mail correspondence between Whitten, Seuss and various Board members contemporaneously with the negotiation of the Bridge Loan, it is referred to as a "loan" or "debt" but never as an equity investment.

43. The fact that the Whittens and the Other Investors were referred to as "investors" does not indicate that the Bridge Loan was an equity investment. The term "investor" can be, and is, used for an individual who invests money in a debt or equity instrument. The use of the term is not determinative of the characterization of the Bridge Loan as debt or equity.

44. Whitten and INC considered, but rejected, a proposal that the investment take the form of equity and a proposal to include warrants and convertibility features. Instead, they consciously chose to treat the funds as a form of debt. The Court does not view the fact that the players considered the possibility of an equity investment as indicating that the Bridge Loan was, in fact, equity. Rather, it indicates that equity was an option that was considered and rejected.

45. John Morgan, an attorney at the Seattle law firm of Perkins Coie LLP, who represented INC, concluded that the Bridge Loan was likely to be treated as debt from a federal income tax perspective. He noted that the speculative nature of the note could favor characterization of the investment as equity from a federal tax perspective but, after considering various factors, concluded that it was more akin to debt than equity. That tends to demonstrate that INC considered the Bridge Loan to be debt.

46. The Bridge Loan was treated as a loan on INC's books. The company followed formalities associated with a loan and promissory notes were executed.

47. Expert testimony was offered by Ms. Lynda Borucki for plaintiff and Dr. Brian Cody for defendants. While the Court found both experts to be credible, the analysis of Dr. Cody was more thorough, unbiased and convincing than that of Ms. Borucki.

48. The Court rejects Ms. Borucki's suggestion that the Bridge Loan was equity rather than debt because it was not certain whether the Investors would recover their investment. It accepts Dr. Cody's testimony that in almost any investment, debt or equity, there is some uncertainty of repayment and the debtor's ability to repay is based, in part, upon the debtor's performance. This uncertainty is typically reflected in the interest rate of the instrument.

49. The Court also rejects Ms. Borucki's suggestion that the fact that the Bridge Loan carried a 35% interest rate renders it akin to equity. It accepts Dr. Cody's explanation that the interest rate reflects the risk of an investment, not its

underlying character, and that the rights and responsibilities associated with an investment, rather than the rate of return, indicate whether it is debt or equity. The Bridge Loan's expected rate of return reflects that it was a very risky investment but is not determinative of whether it was equity or debt.

50. Although plaintiff made much of the fact that the Bridge Loan would have had an effective annual interest rate much greater than 35% if the loan were repaid soon after its extension, the Court finds consideration of such a hypothetical situation unhelpful because a) in general, it is unlikely that a company would voluntarily pay off debt early if it had nothing to gain by doing so, b) INC, not the Investors, had the right to decide when to repay the loan and c) INC's finances, with which all involved parties were familiar, made it clear that early repayment of the Bridge Loan was highly unlikely.

51. Certain Board members suggested that the 35% interest rate on the Bridge Loan could be considered a fee or a discount on the next equity financing round. That does not, however, bear upon whether the Bridge Loan is considered to be debt or equity.

52. The Court finds that the following factors with respect to the Bridge Loan favor its characterization as debt rather than equity:

a) the Promissory Notes were valid contracts and gave the Investors a contractual right to repayment, which is typical of debt claimants but not equity claimants;

b) the Investors did not receive voting rights, Board seats or other control rights as a result of their investment in the Bridge Loan, and such lack of control is typical of debt holders but not equity holders; and

c) the Investors' return was set by, and limited to, the interest rate stated in the Promissory Notes and even if INC's value had skyrocketed, the Investors could not receive more than a 35% return, something that is atypical of equity investments which are generally characterized by unlimited growth potential.

**D. Insider Status**

53. The Bridge Loan was the result of an arm's length negotiation between the Whittens and INC management.

54. Whitten was interested in joining the Board and becoming a part of INC's "decision making clique" but he never assumed either role. While Whitten's extension of the Bridge Loan may have been motivated, in part, by a desire to attain a Board or other controlling position within the company, that subjective intent, alone, if it existed, did not confer upon him any control or render him an insider.

55. The Whittens did not act in concert with the Other Investors during the negotiation of the Bridge Loan, could not compel others to participate and had no definite knowledge of such participation until shortly before the funds were advanced. None of the Other Investors was contractually obligated to participate in the Bridge Loan.

56. By the time the Other Investors decided to participate in the Bridge Loan, its essential terms, including the 35% interest rate, had been agreed upon.

57. At the time the Bridge Loan was approved, the Whittens owned 14.6% of the stock of INC but only 3.8% of the voting shares of INC. The discrepancy was due to the fact that the Whittens owned unconverted Series G and H shares, which did not have voting rights. Together, the

Investors owned 30% of the stock of INC but 43.6% of the voting shares of INC.

### E. Inequitable Conduct

58. The Whittens advanced funds pursuant to the Bridge Loan because they thought it would enable INC to survive, become profitable and eventually afford generous returns to its shareholders. They thought that INC could prosper and that there was at least a reasonable chance that the Bridge Loan would be paid off, with interest, in cash or in another acceptable form (such as stock).

59. Without exception, all of the relevant players, including the Whittens, Seuss, Jeffrey Cooper, the CFO of INC, and the Board members, believed that negotiating the Bridge Loan was in the best interests of INC.

60. Had the Whittens not agreed to make the Bridge Loan, it is unlikely that any investor would have advanced equity or debt funding to INC in early 2001. In that event, INC most likely would have gone bankrupt in early 2001 and would have been liquidated. American Twine, in turn, as an unsecured creditor, would have received no (or very little) dividend in the bankruptcy proceedings.

61. Because the Whittens extended additional funding to INC and, later, invested heavily in LLC, those entities survived for approximately six months beyond their otherwise impending demise. As a result, American Twine received rent payments of approximately $800,000 that it would not have received had the Whittens not negotiated the Bridge Loan.

62. American Twine conceded, through its representative, Anthony M. Gotschalk, that if INC had not received the Bridge Loan, it is unlikely that INC would have stayed in business and that would have

been adverse to the interests of American Twine.

63. The Court finds that the Whittens did not, therefore, engage in any inequitable conduct with respect to the Bridge Loan.

### F. American Twine's Conduct

64. The Court finds that DKSW did not meet its burden of proving that American Twine:

a) converted any of its assets;

b) was unjustly enriched at its expense; or

c) engaged in unfair or deceptive acts or practices.

## II. *Conclusions of Law*

### 1. Equitable Subordination / Recharacterization

A. A loan or advance made by an investor to a company may, in certain circumstances, be treated as a capital contribution rather than as a loan. *In re AtlanticRancher*, 279 B.R. 411, 433 (Bankr. D.Mass.2002); *Yankee Microwave v. Petricca Communication Sys., Inc.*, 53 Mass. App.Ct. 497, 522, 760 N.E.2d 739 (2002); *Friedman v. Kurker*, 14 Mass.App.Ct. 152, 159–60, 438 N.E.2d 76 (1982).

B. If an advance is treated as a capital contribution instead of a loan, a claim for repayment of that advance will be subordinated to the claims of other creditors. *Yankee Microwave*, 53 Mass. App.Ct. at 523, 760 N.E.2d 739.

C. Equitable subordination and recharacterization, commonly associated with bankruptcy cases, are not treated as two separate causes of action here because plaintiff's complaint asserted them together as one claim.

### i. *Yankee Microwave: State Law Factors*

D. Whether an advance should be treated as a capital contribution to, rather than creating a debt of, an entity depends upon 1) the objective intent of the contributor and 2) whether, in the particular circumstances, equitable considerations require treatment of the advance as a capital contribution. *Yankee Microwave*, 53 Mass.App.Ct. at 522, 760 N.E.2d 739.

E. The objective intent of the Whittens, as well as the Other Investors, was that the Bridge Loan created debt. In the circumstances present here, equitable considerations do not require treatment of the Bridge Loan as a capital contribution.

### ii. *Atlantic Rancher: Federal Law Recharacterization Factors*

F. Factors that federal courts consider in determining whether to recharacterize loans as capital contributions in the bankruptcy context are relevant to this Court's equitable subordination/recharacterization analysis and to its analysis of the objective intent of the Whittens. Those factors, which tend to suggest that the subject funding is either debt or equity, are: 1) the adequacy of capital contributions; 2) the ratio of shareholder loans to capital; 3) the amount or degree of shareholder control; 4) the availability of similar loans from outside lenders; 5) whether the ultimate financial failure was caused by undercapitalization; 6) whether the note included payment provisions and a fixed maturity date; 7) whether a note or other debt document was executed; 8) whether advances were used to acquire capital assets; and 9) how the debt was treated in the business records. The factors must be considered in the aggregate and no one factor is determinative. *In re AtlanticRancher*, 279 B.R. at 433 (citing *In re Hyperion Enterprises*, 158 B.R. 555, 561 (D.R.I.1993)).

G. At the time the Bridge Loan was executed:

1) INC did not have sufficient capital to carry on its business and, hence, INC was undercapitalized;

2) INC had little capital of significance and the ratio of shareholder loans to capital was, therefore, greater than one to one; and

3) the Whittens were minority shareholders who did not control INC. Although Whitten occasionally attended board meetings and was more involved in INC than most shareholders, he cannot be said to have exercised control over INC.

H. INC was unable to attract a similar loan from any other investor. Although many other potential investors had the opportunity to participate in the Bridge Loan, only three individuals besides the Whittens did, and they were not willing to contribute more than $500,000 each.

I. INC's ultimate failure was not caused by undercapitalization, but rather by its poor business model, astronomical expenses, a competitively unattractive product, and outside forces such as the burst of the internet "bubble".

J. The Bridge Loan contained repayment provisions and a fixed maturity date. Promissory Notes and a Security Agreement were executed and the Whittens and INC exercised all of the formalities associated with creating a valid loan agreement.

K. In general, advances for operational expenses are indicative of debt. *Hyperion Enterprises*, 158 B.R. at 560. The Bridge loan advances were used primarily for operational expenses, although some of the proceeds were used to acquire capital equipment.

L. The Bridge Loan was treated as debt in INC's business records.

M. Some of the *AtlanticRancher* factors favor treating the Bridge Loan as capital and some favor treating it as debt. In the aggregate, an analysis of the *AtlanticRancher* factors leads convincingly, but not overwhelmingly, to the conclusion that the Bridge Loan should be treated as debt.

### iii. *604 Columbus Avenue Realty: Federal Law Equitable Subordination Factors*

■■■ N. Factors that federal courts consider when applying equitable subordination in the bankruptcy context also inform this Court's equitable subordination/recharacterization analysis. A bankruptcy court will subordinate a claim if 1) the claimant engaged in some kind of inequitable conduct, 2) the misconduct caused injury to other creditors or conferred an unfair advantage to the claimant and 3) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. *In re 604 Columbus Ave. Realty*, 968 F.2d 1332, 1353 (1st Cir. 1992) (quoting *In re Mobile Steel Co.*, 563 F.2d 692, 703 (5th Cir.1977)). With respect to the first prong, the court considers inequity vis-a-vis other creditors. *Id.* at 1360 (quoting *In re Giorgio*, 862 F.2d 933, 939 (1st Cir.1988)). Furthermore, when the claimant is an insider a court will rigorously scrutinize claims arising between the debtor and the claimant, but when the claimant is not an insider, evidence of more egregious misconduct, such as fraud, spoliation or overreaching, is necessary. *Id.* (quoting *In re Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir.1991)).

O. Under M.G.L. c. 109A § 2, "insiders" of a corporation include, in relevant part, directors, officers, persons in control of the corporation and "affiliates" of the corporation. "Affiliates" include persons (or other legal entities) that own, control or have voting power over at least 20% of the corporation's outstanding shares.

P. The Whittens were not "insiders" because they were not directors, officers, controlling shareholders or affiliates of INC.

Q. Although King and Smith may have been insiders, their insider status cannot be subrogated to the Whittens. They did not act in concert with the Whittens with regard to the negotiation of the Bridge Loan or Whitten's extension of funds under the Bridge Loan.

R. No evidence of egregious misconduct on the part of the Whittens, such as fraud, spoliation or overreaching, was presented.

S. Even if the Whittens were considered to have been insiders of INC, equitable subordination would not be appropriate because 1) the Whittens did not engage in any kind of inequitable conduct and 2) the Whittens' actions did not injure American Twine or confer an unfair advantage upon themselves.

### iv. *Conclusion*

T. As suggested by the analysis along the lines of *Yankee Microwave, AtlanticRancher* and *604 Columbus Avenue Realty*, the Bridge Loan was properly characterized as debt and should not be equitably subordinated.

### 2. Fraudulent Transfer

U. Plaintiff's fraudulent transfer claims can succeed only if this Court recharacterizes or equitably subordinates the Bridge Loan.

V. Because the Bridge Loan will not be recharacterized or equitably subordinated, Plaintiff's fraudulent transfer claims fail. The Court declines to hold that the trans-

**24**

fer of INC's assets to the Investors was a fraudulent transfer pursuant to M.G.L. c. 109A.

### 3. Estoppel

W. Anthony M. Gotschalk did not have sufficient information regarding the Bridge Loan at the time he signed the Assignment of Lease on behalf of American Twine that it should be estopped from bringing this lawsuit.

### 4. Counterclaims

X. DKSW brought counterclaims against American Twine for 1) conversion, 2) unjust enrichment and 3) unfair or deceptive acts or practices in violation of M.G.L. c. 93A. It has failed to sustain its burden of proof with respect to any of those counterclaims.

### ORDER

In accordance with the foregoing Memorandum of Decision:

1) judgment will enter for defendants on Counts I, II, III, IV and VI of plaintiff's second amended complaint; and

2) judgment will enter for plaintiff on Counts I, II and III of defendants' counterclaims.

**So ordered.**